1 | LEONARD L. GUMPORT (Bar No. 86935)
*lgumport@gumportlaw.com*
2 | ANDREW S. ROTTER (Bar No. 86725)
*arotter@gumportlaw.com*
3 | PETER J. MASTAN (Bar No. 190250)
*pmastan@gumportlaw.com*
4 | GUMPORT | MASTAN
550 South Hope Street, Suite 825
5 | Los Angeles, California 90071-2627
Telephone: (213) 452-4900
6 | Facsimile: (213) 623-3302

7 | Attorneys for Ronald L. Durkin,
Chapter 11 Trustee
8

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **LOS ANGELES DIVISION**

12 | In re )   **Bk. No. 2:10-bk-19929-BR**

13 | )   **CHAPTER 11**

14 | CAPCO GROUP, LLC, )

 | )   **OPPOSITION OF TRUSTEE TO**
15 | Debtor. )   **MOTION OF LIBRARY ASSET**
 | )   **ACQUISITION COMPANY LTD. TO**
 | )   **PROHIBIT TRUSTEE FROM USING**
16 | )   **CASH COLLATERAL; (2)**
 | )   **SEQUESTER CASH COLLATERAL**
17 | )   **AND (3) PROVIDE ACCOUNTING OF**
 | )   **ALL POST-PETITION RECEIPTS;**
18 | )   **STAY; MEMORANDUM OF POINTS**
 | )   **AND AUTHORITIES;**
19 | )   **DECLARATIONS OF RONALD L.**
 | )   **DURKIN AND LEONARD L.**
20 | )   **GUMPORT; AND EXHIBITS**

21 | )   **[Identical papers are filed in ThinkFilm,**
 | )   **CapCo Group, and CT-1 Holdings**
22 | )   **cases.]**

23 | )   **[Filed under separate covers are**
 | )   **evidentiary objections and request to**
24 | )   **take judicial notice.]**

25 | )

 | )   **DATE:**   November 23, 2010
26 | )   **TIME:**   2:00 P.M.
 | )   **PLACE:**   Courtroom 1668
27 | )         **[Hon. Barry Russell]**

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................. 1

II.   SUMMARY ..................................................... 1

III.  FACTS ....................................................... 3

IV.   THE MOTION SHOULD BE DENIED ................................ 5

    A.    The Motion Was Pretextual and Was Filed Purely to Harass .............. 5

    B.    LAAC Has Joined in Complaints Containing Admissions that the
        ThinkFilm Loans Are Illegal and Unenforceable ...................... 6

    C.    Warshawsky's Deposition Further Reveals LAAC's Bad Faith and
        Lack of Credibility .............................................. 7

V.    CONCLUSION ................................................. 8

DECLARATION OF LEONARD L. GUMPORT ............................. 9

DECLARATION OF RONALD L. DURKIN ............................... 13

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brewer v. Erwin & Erwin, P.C. (In re Marquam Investment Corp.)*,
942 F.2d 1462 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pepper v. Litton*,
308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939) . . . . . . . . . . . . . . . . . . . . . . . 7

*Morgan Creek Productions, Inc. v. Franchise Pictures LLC
(In re Franchise Pictures LLC)*
389 B.R. 131 (Bankr. C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Whitesides v. Kilimnik (In re Stoumbos)*,
988 F.2d 949 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATUTES

11 U.S.C. § 510(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed.R.Bankr.P. 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 9

1                     **OPPOSITION TO LAAC'S CASH COLLATERAL MOTION**

2   **I.**     **INTRODUCTION**

3         This opposition responds to the cash collateral motion ("Motion") filed on Monday

4 evening, October 25, 2010, by Library Asset Acquisition Co., Ltd. ("LAAC"), after it knew

5 that there was no reason to file the Motion. The Motion has no merit and should be denied.

6         This opposition is filed by Ronald L. Durkin in his capacity as chapter 11 trustee

7 ("Trustee") in the three cases in which LAAC filed the Motion. Those three cases are

8 entitled:  (1) *In re ThinkFilm, LLC*, Bk. No. 2:10-19912-BR; (2) *In re CT-1 Holdings, LLC*,

9 Bk. No. 2:10-bk-19927-BR; and (3) *In re CapCo Group, LLC*, Bk. No. 2:10-bk-19929-BR.

10 The Trustee is the permanent trustee in the *ThinkFilm* case, and he is the interim trustee in the

11 *CapCo Group* and *CT-1 Holdings* cases.

12         The Trustee concurrently submits identical versions of this opposition to LAAC's

13 Motion in the *ThinkFilm, CapCo Group*, and *CT-1 Holdings* cases. The Trustee's opposition

14 papers consist of: (1) this memorandum (with attached declarations of Ronald L. Durkin and

15 Leonard L. Gumport), (2) a request to take judicial notice (the "Request"), and (3) evidentiary

16 objections to the October 25, 2010 declaration of Evan Warshawsky ("Warshawsky").

17   **II.**     **SUMMARY**

18         LAAC filed the Motion to harass the Trustee. As reflected by Exhibits 6 and 7, LAAC

19 knew before it filed its Motion that there was no reason to do so. The refusal of Warshawsky

20 to answer questions about what LAAC's counsel negotiated to pay to Warshawsky before he

21 signed his declaration highlights LAAC's lack of good faith. *See* Ex. 9.

22         The Motion was filed as a transparent attempt to waste the time of the Court, the

23 Trustee, and his counsel concerning $51,215 that LAAC claims is cash collateral under the

24 so-called "ThinkFilm Loan."

25         The Motion is an exercise in doublethink. Concurrently with the Motion, LAAC and

26 its myriad affiliates are pursuing a complaint alleging that the ThinkFilm Loan is illegal and

27 unenforceable. In that same complaint, LAAC and its co-plaintiffs also seek rescission of

28 underlying loan documents (including the ThinkFilm Loan), plus LAAC's assumption of

1 | those loans. The ThinkFilm Loan is the same loan that LAAC's Motion insists is valid and

2 | enforceable. In bad faith, LAAC seeks to utilize the ThinkFilm Loan as the basis of its efforts

3 | to tie up all funds in the estate, the better to shut down the Trustee's investigation.

4 |      Strangely, while only $51,215 in funds have been turned over to the Trustee, the

5 | Debtors have been represented by swarms of lawyers in opposing the Trustee's Rule 2004

6 | motions and other efforts to diligently administer the Debtors' bankruptcy estates. Similarly,

7 | the Debtors have had no shortage of counsel in opposing the petitioning creditors. The big

8 | question raised by LAAC's Motion is why so little has been turned over to the Trustee by the

9 | Debtors while they seemingly have access to unlimited funds to fight the Trustee.

10 |      LAAC and its principals, current and former insiders named David Bergstein

11 | ("Bergstein") and Ronald Tutor ("Tutor"), provide no declaration or accounting for the

12 | contradictory positions taken by them and their controlled entities in the "Zwirn"-related

13 | litigation and in this Court. Bergstein is resoundingly silent notwithstanding that, on July 20,

14 | 2010, the Court designated Bergstein as the "Debtor" in each of the five bankruptcy cases.

15 |      Instead, LAAC seeks to support the Motion with the Warshawsky declaration.

16 | Washawsky, however, provides patently inadmissible legal conclusions concerning the

17 | perfection of LAAC's security interests. Separately, the Trustee files evidentiary objections

18 | to Warshawsky's declaration.

19 |      Lack of admissibility is only one of the problems surrounding the Warshawsky

20 | declaration submitted by LAAC. A bigger problem is Warshawsky's lack of credibility.

21 | Among other things, these events occurred during Warshawsky's deposition:

22 |         (1)    LAAC's counsel, Jeffrey Garfinkle, Esq., of Buchalter

23 |         Nemer, directed Warshawsky to refuse to answer any questions

24 |         about compensation paid to Warshawsky in connection with

25 |         hiring him the month before he signed his October 25, 2010

26 |         declaration;

27 |         (2)    after repeatedly attempting to evade answering the

28 |         Trustee's questions, Warshawsky conceded that he did not have

1  personal knowledge that any money from the loans that LAAC

2  seeks to enforce was actually deposited into a bank account in the

3  name of ThinkFilm.  In other words, for all Warshawsky knows,

4  the ThinkFilm Loan was a fraudulent obligation for which

5  ThinkFilm agreed to pay more than $40 million while actually

6  receiving in its bank account little or none of the money; and

7  (3)      Warshawsky has no knowledge whether any copyright

8  mortgage was ever filed against CapCo Group, even though that

9  step is necessary when seeking to perfect a security interest in a

10  registered copyright.

11  In summary, the LAAC Motion is not credible.  The contradictory positions of LAAC

12  and its co-litigants and the still-hidden financial bias of Warshawsky make the assertions in

13  the LAAC Motion not worthy of belief.  The needless filing of the LAAC Motion after LAAC

14  was told that the Trustee would not use the purported cash collateral without further notice

15  (*see* Exs. 6-7) leave no doubt that LAAC filed the Motion purely to harass the Trustee and to

16  inflict delay and expense on the estate administered by the Trustee.

17  **III.    FACTS**

18  On March 17, 2010, creditors filed involuntary bankruptcy petitions against the five

19  Debtors, including CapCo Group, CT-1 Holdings, and ThinkFilm.

20  On or about March 30, 2010, in the five involuntary cases (the "Bankruptcy Cases"),

21  the Bankruptcy Court ordered the appointment of an interim trustee.  During April 2010, Mr.

22  Durkin was appointed interim chapter 11 of the bankruptcy estates of each of the Debtors.

23  On April 27, 2010, Bergstein, Tutor, CapCo, CT-1, ThinkFilm, and other affiliates

24  filed a complaint in Los Angeles Superior Court.  The complaint named as defendants D.B.

25  Zwirn Special Opportunities Fund ("Zwirn") and other entities (the "Zwirn Group") that

26  purportedly loaned funds to ThinkFilm and others.  The prayer at pages 23-24 of the

27  complaint included requests for rescission and a declaration that the ThinkFilm Loan was

28  "illegal" and "unenforceable."  *See* Request, Ex. 2.

3.

1    At a hearing on July 20, 2010, in the Bankruptcy Cases, the Bankruptcy Court

2  overruled objections by Bergstein and Tutor and their affiliates to prevent Rule 2004 exams

3  by the Trustee.

4    At a hearing on July 28, 2010, in the Bankruptcy Cases, the Bankruptcy Court denied

5  motions by the Debtors to regain control of their assets from the Trustee. At the same

6  hearing, the Bankruptcy Court further ruled that the Trustee would be entitled to control the

7  attorney-client privilege of each Debtor if and when an order for relief was entered.

8    On August 16, 2010, Bergstein, Tutor, LAAC, and other affiliates filed an amended

9  complaint against the Zwirn Group in Los Angeles Superior Court. The prayer at pages 37-38

10  of the amended complaint included requests for rescission and a declaration that the

11  ThinkFilm Loan was "illegal" and "unenforceable." *See* Request, Ex. 3.

12    On September 3, 2010, the High Court of Justice, Chancery Division, Companies

13  Court, in the United Kingdom filed a judgment questioning the dealings between Bergstein

14  and one of the Debtors' affiliates, Capitol Films Development. Among other things, the UK

15  High Court of Justice questioned whether Bergstein had back-dated a transaction in an effort

16  to remove motion pictures from the ownership of Capitol Films Development prior to its

17  insolvency proceedings. *See* Request, Ex. 1. The LAAC Motion says nothing about this.

18    On the evening of Friday, October 1, 2010, on behalf of LAAC, Mr. Garfinkle filed a

19  motions for relief from the automatic stay in the *CT-1 Holdings* and *ThinkFilm* Bankruptcy

20  Cases. These motions (the "LAAC Stay Relief Motions") were filed the week before

21  scheduled hearings on summary judgment motions for entry of orders for relief against

22  ThinkFilm and Capitol Films Development. The entry of those orders for relief would

23  entitled the Trustee to get access to documents previously withheld based on claims of

24  attorney-client privilege.

25    On October 6, 2010, in the Bankruptcy Cases, the Bankruptcy Court ruled that it would

26  enter orders for relief against ThinkFilm and Capitol Films Development. On the same day,

27  the Trustee made demands on current and former counsel for ThinkFilm and Capitol Films

28  Development to give the Trustee access to those entities' attorney-client files. Through

1 | November 8, 2010, the requested files are still in the process of being produced to the Trustee.

2 | *See* Gumport Decl., ¶ 9 and Ex. 4.

3 | In or about October 2010, the Zwirn Group removed the lawsuit filed by Tutor,

4 | Bergstein, LAAC and their affiliates to the United States District Court for the Central

5 | District of California.  On October 6, 2010, Tutor, Bergstein, LAAC and their affiliates filed a

6 | second amended complaint against the Zwirn Group.  The prayer at pages 50-51 of the second

7 | amended complaint included requests for rescission and a declaration that the ThinkFilm

8 | Loan was "illegal" and "unenforceable."  Request, Ex. 4.

9 | October 25, 2010 was the day before the hearing on the LAAC Stay Relief Motions.

10 | During the morning of October 25th, LAAC's counsel, Mr. Garfinkle (whose co-counsel,

11 | Lucia Coyoca, received written notice of the Trustee's turn-over demand), was told that

12 | approximately $51,000 was all the funds that had been turned over to the Trustee, would be

13 | sequestered, and would not be used without further notice.  *See* Gumport Decl., ¶¶ 11-13 and

14 | Exs. 5-7.  During the evening of October 25th, LAAC filed Motions to sequester its purported

15 | cash collateral based on LAAC's status as purported assignee of the ThinkFilm Loan.

16 | On October 26, 2010, in the Bankruptcy Cases, the Bankruptcy Court denied the

17 | LAAC Stay Relief Motions.  Among other things, the Court observed that the Trustee had

18 | raised substantial issues concerning the purported validity of loans and security interests that

19 | LAAC sought to enforce.  Following that hearing, the Trustee asked LAAC to withdraw its

20 | Motions concerning use of cash collateral.  LAAC refused.

21 | On November 3, 2010, the Trustee's counsel took the deposition of Warshawsky.  At

22 | the deposition, LAAC's counsel instructed Warshawsky not to testify about the compensation

23 | that LAAC's counsel, Mr. Garfinkle, had negotiated to pay Warshawsky beginning or about

24 | September 2010, i.e., the month preceding his signing his declaration on October 25th.

25 | **IV.    THE MOTION SHOULD BE DENIED**

26 | **A.    The Motion Was Pretextual and Was Filed Purely to Harass**

27 | The first "cash collateral" demand made by LAAC occurred on Friday, October 22,

28 | 2010, approximately two days after Trustee's counsel insisted that Bergstein cause Bank of

1    America to cooperate in turning over funds. The following Monday morning, on October 25,

2    2010, the Trustee's counsel told LAAC's in writing that the funds turned over (approximately

3    $51,000) were all the funds that the Trustee had ever received and would not be used without

4    further notice. Many hours later, on the evening of October 25th, LAAC nevertheless filed its

5    pointless Motion. The next day, October 26th, LAAC was told by the Court that there were

6    substantial issues concerning LAAC's purported security interests under the ThinkFilm Loan.

7    The Trustee then requested LAAC to withdraw (without prejudice) its Motion. Instead,

8    LAAC insisted on litigating this matter. Under the circumstances, no purpose could be served

9    other than inflicting time and expense on the Trustee while he was engaged in the far more

10    serious tasks of preparing his report and getting a turn-over of attorney-client files.

11    **B.    LAAC Has Joined in Complaints Containing Admissions that the**

12    **ThinkFilm Loans Are Illegal and Unenforceable**

13    During April-October 2010, Bergstein, Tutor, and their affiliates have filed at least

14    three complaints against the Zwirn Group. Bergstein and/or Tutor admittedly control LAAC,

15    and LAAC has joined in the second and third complaints and the Zwirn Group. All these

16    three complaints end with prayers asking for judgments that rescind the ThinkFilm Loan and

17    that declare the ThinkFilm Loan to be illegal and unenforceable. *See* Request, Exs. 2-4.

18    Notwithstanding these admissions, two of which were made in court-filed complaints

19    in which LAAC served as a co-plaintiff with Bergstein and Tutor, LAAC alleges that LAAC

20    surely has valid first priority security interests under the ThinkFilm Loan. There is no reason

21    for the Court to believe LAAC under the circumstances.

22    The silence of Bergstein and Tutor is resounding. They are co-plaintiffs in the three

23    complaints filed against the Zwirn Group. As stated, in each complaint, the prayer sought

24    rescission and a declaration that the ThinkFilm Loan was "unenforceable" and "illegal."

25    Although Bergstein and Tutor are current and/or former insiders and control LAAC, neither

26    Bergstein nor Tutor provides any declaration in support of LAAC's disingenuous Motion.

27    Silence does not constitute candor. Silence by the insiders cannot satisfy the "rigorous

28    scrutiny" that applies to insider transactions involving LAAC's purported acquisition and

6.

1    enforcement of the ThinkFilm Loan, while simultaneously telling other courts (state and

2    federal) that the ThinkFilm Loan is unlawful and unenforceable.  "The Supreme Court has

3    instructed that an insider's dealings with a bankrupt corporation must be 'subjected to

4    rigorous scrutiny.'" *Brewer v. Erwin & Erwin, P.C. (In re Marquam Investment Corp.)*, 942

5    F.2d 1462, 1465 (9th Cir. 1991) (quoting *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238,

6    84 L.Ed. 281 (1939) ("*Pepper*").)

7          "When the validity of an insider's contract with a corporation is at issue, the burden is

8    on the insider 'not only to prove the good faith of the transaction but also to prove its inherent

9    fairness from the viewpoint of the corporation and those interested in it." *Marquam*, 942 F.2d

10   at 1465 (quoting *Pepper*, 308 U.S. at 306).

11         Moreover, the insider's purportedly secured claim does not constitute an invulnerable

12   shield to insider misconduct, because 11 U.S.C. § 510(c) gives the Bankruptcy Court the

13   power to equitably subordinate an insider's claim. *See Whitesides v. Kilimnik (In re*

14   *Stoumbos)*, 988 F.2d 949, 960 (9th Cir. 1993) (upon review of evidence of self-dealing by an

15   insider who held a secured claim, the Ninth Circuit concluded:  "We reverse the bankruptcy

16   court's holding that Kilimnik's claim should not be equitably subordinated.")

17         "The essence of the test is whether or not under all the circumstances the transaction

18   carries the earmarks of an arm's length bargain.  If it does not, equity will set it aside."

19   *Marquam*, 942 F.2d at 1465 (quoting *Pepper*, 308 U.S. at 306-07).

20         **C.    Warshawsky's Deposition Further Reveals LAAC's Bad Faith**

21                **and Lack of Credibility**

22         As set forth in the concurrently filed evidentiary objections, the Warshawsky

23   declaration is inadmissible to the extent it consists of efforts to opine on validity and priority

24   of LAAC's security interests under the ThinkFilm Loan.  Equally important, the Warshawsky

25   declaration is incredible in light of Warshawsky's deposition testimony on November 3, 2010.

26         At that deposition, it became apparent that LAAC's counsel and Warshawsky are so

27   desperate to conceal Warshawsky's financial bias that LAAC's counsel directed Warshawsky

28   to refuse to answer questions on that subject. *See* Ex. 9 [Warshawsky Depo. Trans., pp. 7-10,

F:\CLIENTS\Thinkfilm\Pleadings\LAAC Cash Collat Opp 11-9-10.CapCo.wpd

36.] Warshawsky also admitted that, despite his review of LAAC's books and records, he has not seen records showing transfers of the purported $29 million and $40 million in loan funds into bank accounts in the name of ThinkFilm, Zoopraxis, and FPLAC. [*Id.*, pp. 20-27.]  Of course, if the borrowers never received the "loan," then they have a substantial argument that the loans are fraudulent obligations.

Warshawsky further admitted that he has not seen any copyright mortgage filings against any copyrights of CapCo [Request, Ex. 9, p. 28], even though LAAC's Motion purports to claim a perfected security interest in proceeds of CapCo's assets. *See Morgan Creek Productions, Inc. v. Franchise Pictures LLC (In re Franchise Pictures LLC)*, 389 B.R. 131, 143-44 (Bankr. C.D. Cal. 2008) (discussing and citing authorities re perfection of security interests by filing with Copyright Office).

## V.    CONCLUSION

The Motion should be denied.

DATED:  November 9, 2010

Respectfully submitted,

GUMPORT | MASTAN

By: _____

Leonard L. Gumport
Attorneys for Ronald L. Durkin,
Trustee

F:\CLIENTS\Thinkfilm\Pleadings\LAAC Cash Collat Opp 11-9-10.CapCo.wpd

## DECLARATION OF LEONARD L. GUMPORT

**I, LEONARD L. GUMPORT, state:**

1.      I am a partner in Gumport | Mastan, counsel for Ronald L. Durkin in his capacity as trustee ("Trustee") in five bankruptcy cases ("Bankruptcy Cases") entitled (1) *In re R2D2, LLC*, Bk. Case No. 2:10-bk-19924-BR; (2) *In re ThinkFilm, LLC*, Bk. No. 2:10-19912-BR; (3) *In re CT-1 Holdings, LLC*, Bk. No. 2:10-bk-19927-BR; (4) *In re CapCo Group, LLC*, Bk. No. 2:10-bk-19929-BR; and (5) *In re Capitol Films Development, LLC*, Bk. No. 2:10-bk-19938-BR.  In this declarations, the five debtors in those cases are collectively referred to as the "Debtors."

2.      In the Bankruptcy Cases, I began providing services to the Trustee in April 2010.  On behalf of the Trustee, I have personally communicated with Jeffrey Garfinkle, Esq., of Buchalter Nemer, which has appeared as counsel of record for Ronald N. Tutor ("Tutor"), Library Asset Acquisition Company, Ltd. ("LAAC"), and Pangea Media Group, LLC ("Pangea").  I have attended hearings and conducted Rule 2004 examinations in the Bankruptcy Cases.  I personally conducted the deposition of Evan Warshawsky on November 3, 2010.  I have personal knowledge of each fact stated in this declaration and, if called as a witness, would testify competently to those facts.

3.      On April 29, 2010, I sent an email to David Weinstein, Esq., who was then counsel of record for the Debtors.  **Exhibit 1** is a copy of that email.  **Exhibit 2** is a copy of the complaint referred to in paragraph "THIRD" of that email.  In August 2010, after the hearings referred to in paragraphs 4 and 5 of this declaration, the plaintiffs amended that complaint, and they amended it again in October 2010.

4.      At a hearing that I attended on July 20, 2010 in the Bankruptcy Cases, the Bankruptcy Court overruled objections that Messrs. Bergstein and Tutor and LAAC (among others) had made to Rule 2004 motions filed by the Trustee.

5.      At a hearing that I attended on July 28, 2010 in the Bankruptcy Cases, the Bankruptcy Court ruled that the Trustee would have control of the attorney-client privilege of each of the Debtors in those cases if and when order for relief was entered.

6.    On or about August 20, 2010, petitioning creditors filed motions for summary judgments in the *ThinkFilm LLC* and *Capitol Films Development LLC* Bankruptcy Cases. The hearing on these motions (the "SJ Motions") took place on October 6, 2010.

7.    Through October 1, 2010, the Debtors did not file any opposition to SJ Motions.

8.    On evening of Friday, October 1, 2010, Mr. Garfinkle (counsel for LAAC) served motions in the *ThinkFilm LLC* and *Capitol Films Development* Bankruptcy Cases to obtain relief from the automatic stay. I first received those motions (the "LAAC Stay Relief Motions") on Saturday, October 2nd.

9.    On October 6, 2010, I attended a hearing in the Bankruptcy Cases at which the Bankruptcy Court ruled that it would grant summary judgments entering orders for relief in the *ThinkFilm LLC* and *Capitol Films Development* Bankruptcy Cases. That same day, I made requests to current and former counsel for the Debtors to turn over attorney-client files of ThinkFilm LLC that had been previously withheld from the Trustee based on a claim of attorney client privilege. **Exhibit 3** is a copy of an email I sent on October 6, 2010. Through November 8, 2010, documents requested by me on the Trustee's behalf are still in the process of being turned over. **Exhibit 4** is a copy of an email thread between me and one of prior counsel for ThinkFilm.

10.    Joseph Eisenberg, Esq. of Jeffer Mangels was counsel for all of the Debtors through the October 6th hearing and remains counsel for R2D2, CT-Holdings, and Capco Group. Jennifer Chang, Esq. of the Bird Marella law firm is personal counsel to David R. Bergstein. Lucia Coyoca, Esq. of Mitchell Silberberg (with Mr. Garfinkle's law firm, Buchalter Nemer) is counsel for LAAC and Mr. Tutor.

11.    On Wednesday, October 20, 2010, I sent an email to Mr. Eisenberg (counsel for the Debtors), Ms. Chang (counsel for Mr. Bergstein) and Ms. Coyoca (counsel for LAAC and Mr. Tutor) requesting the turnover of funds held at the Newbury Park branch of Bank of America. **Exhibit 5** is a copy of that email.

12.    On the morning of Friday, October 22, 2010, I was at the office of Mr. Eisenberg of Jeffer Mangels. Mr. Eisenberg's office was producing to me certain of the files

1    of the Debtors that had been previously withheld from the Trustee based on claims of the

2    attorney-client privilege.  Later that same day, I returned to my office in downtown Los

3    Angeles.  There, I received an email from Mr. Garfinkle that is attached as Exhibit 2 to Mr.

4    Garfinkle's declaration that was filed on October 25, 2010 (the "10/25/10 Garfinkle Decl.").

5    That same day, I responded to Mr. Garfinkle's letter with the email attached as Exhibit 3 to

6    the 10/25/10 Garfinkle Declaration.  Mr. Garfinkle never provided the documents (control

7    agreements showing perfection in deposit accounts) requested by me in that Exhibit 3.

8        **13.**    The 10/25/10 Garfinkle Declaration attaches as "Exhibit 4" an email that I sent

9    at approximately 11:27 a.m. on Monday, October 25, 2010.  That same Monday morning,

10   however, I sent Mr. Garfinkle a previous email.  **Exhibit 6** is a copy of that email, which I

11   sent to Mr. Garfinkle at approximately 11:01 a.m. on Monday, October 25th.  Subsequently,

12   at approximately 11:27 p.m., I sent Mr. Garfinkle a further email, which is attached as

13   **Exhibit 7.**

14       **14.**    **Exhibit 8** is a printout of the first page of LAAC's cash collateral motion, with

15   the time-stamp on the document.

16       **15.**    On October 26, 2010, I attended a hearing on the LAAC Stay Relief Motions in

17   the *ThinkFilm LLC* and *CT-1 Holdings LLC* Bankruptcy Cases.  At the hearing, the

18   Bankruptcy Court denied the LAAC Stay Relief Motions.

19       **16.**    Following the October 26th hearing on the LAAC Stay Relief Motions, Mr.

20   Garfinkle agreed to produce Mr. Warshawsky for a deposition in connection with the

21   10/25/10 LAAC Cash Collateral Motions.

22       **17.**    On November 3rd, from approximately 10:00 a.m. to 11:00 a.m., I took the

23   deposition of Mr. Warshawsky.  **Exhibit 9** is a copy of condensed transcript of that

24   approximately one-hour deposition.  Before and during that deposition, I requested Mr.

25   Garfinkle to produce the September 2010 consulting contract that LAAC made with Mr.

26   Warshawsky.  Before and during the November 3rd deposition, Mr. Garfinkle refused to

27   produce that document or to tell me how much and on what terms LAAC agreed to

28   compensate Mr. Warshawsky.  Before the November 3rd deposition commenced, Mr.

F:\CLIENTS\Thinkfilm\Pleadings\LAAC Cash Collat Opp 11-9-10.CapCo.wpd

1  Garfinkle confirmed to me that the deposition of Mr. Warshawsky was not subject to the

2  confidentiality order and that Mr. Garfinkle had notified other parties in interest, including

3  motion picture industry guilds, that they were welcome to attend the deposition.

4      **18.**    Before and after the November 3rd deposition of Mr. Warshawsky, I requested

5  Mr. Garfinkle to withdraw (without prejudice) the 10/25/10 LAAC Cash Collateral Motions.

6  Mr. Garfinkle refused to do so.

7      I declare under penalty of perjury under the laws of the United States of America that

8  the foregoing is true and correct and that this declaration was signed on the 9th day of

9  November, 2010, at Los Angeles, California.

11      _____

12        **LEONARD L. GUMPORT**

12.

1

## DECLARATION OF RONALD L. DURKIN

2    I, RONALD L. DURKIN, state:

3        1.    I am the interim or permanent chapter 11 trustee in the five bankruptcy cases

4    ("Bankruptcy Cases") entitled: (1) *In re R2D2, LLC*, Bk. Case No. 2:10-bk-19924-BR; (2) *In*

5    *re ThinkFilm, LLC*, Bk. No. 2:10-19912-BR; (3) *In re CT-1 Holdings, LLC*, Bk. No. 2:10-bk-

6    19927-BR; (4) *In re CapCo Group, LLC*, Bk. No. 2:10-bk-19929-BR; and (5) *In re Capitol*

7    *Films Development, LLC*, Bk. No. 2:10-bk-19938-BR.  I began serving as an interim chapter

8    11 trustee in the Bankruptcy Cases in April 2010, and have served as trustee in those cases

9    continuously since then.  I have personal knowledge of each fact stated in this declaration

10   and, if called as a witness, I could and would testify competently to those facts from my

11   personal knowledge.

12       2.    Total funds turned over to me in the Bankruptcy Cases to date are

13   approximately $51,215 (on behalf of Capco Group).  These funds are on deposit in a

14   segregated bank account under my control for the bankruptcy estate of Capco Group.

15   None of those funds has been disbursed.  None of those funds will be disbursed except

16   as authorized by the Court.

17       I declare under penalty of perjury under the laws of the United States of America that

18   the foregoing is true and correct and that this declaration was signed on the 8ᵗʰ day of

19   November, 2010 in the County of *Los Angeles* State of California.

20

21

22                              RONALD L. DURKIN

23

24

25

26

27

28                                          **00013**

**Date: Thu, 29 Apr 2010 20:54:06 -0700**
**From: LENNY (Leonard Gumport)**
**To: david.weinstein@hro.com**
**cc: ANDY,ddehner@durkinforensic.com,lec@msk.com,PETER,**
**rdurkin@durkinforensic.com**
**Subject: Thinkfilm et al-THREE URGENT ITEMS**
**Re-Sent-By: LENNY (Leonard Gumport)**

David,

A.  The Interim Trustee's staff were not on the premises today (Thursday), because Mr.
Bergstein did not give them access.

B.  Mr. Bergstein, through his employees, have told the Interim Trustee's staff that the will not
be given access tomorrow.

C.  There is a meeting scheduled at Mr. Bergstein's office at 2 pm on Monday; however, there
are three items that need to be immediately addressed and
a fourth item that is a continuing request.

**FIRST:** Mr. Bergstein and his staff need to immediately confirm whether any income tax
returns were ever filed for any of the Alleged Debtors and, if so,
which ones.  If any exist, they need to turned over immediately.  To date, not a single tax
return for any of the Alleged Debtors has been produced.  This
does not require any time from you or Mr. Bergstein -- All Mr. Bergstein is confirm that they
don't  (or do) exist and then make them available.

If Mr. Bergstein doesn't respond to this question immediately, the Interim Trustee may draw the
inference that the returns haven't been produced
because they don't exist.  Frymi and other staff have told the Trustee's staff that Frymi et al
don't know anything about the Alleged Debtors' tax
returns.

**SECOND:** Mr. Bergstein and his staff need to immediately confirm whether any payroll tax
returns have been filed by the Alleged Debtors (or anyone
purporting to pay payroll for the Alleged Debtors) anytime during the past year.  If such returns
have been filed, they need to be produced immediately.

**THIRD:** The Interim Trustee and I learned today that Mr. Bergstein filed the attached
complaint, purportedly on behalf of the Alleged Debtors.  The
Interim Trustee did not receive prior notice of this filing and did not authorize Mr. Bergstein (or
Mr. Tutor) to file any litigation on behalf of the
Alleged Debtors.  I don't think it was appropriate to file this litigation without the Interim
Trustee's consent -- and Mr. Bergstein's failure to consult
the Interim Trustee about this litigation in advance means that the litigation does not have the
Interim Trustee's consent.  The Interim Trustee
requires an immediate explanation and, in the interim, did not and does not authorize the filing
of the attached complaint.  Mr. Bergstein needs

**FOURTH:** This is related to item nos. 1-3 above (which are the three urgent matters).  Mr.
Bergstein needs to complete the records turnover/imaging process. 00014



11/8/2010

This includes making all of his computers and Frymi's computers available for imaging and preservation, as requested on 4/13/10 and repeatedly requested since then.
This includes permitting the Interim Trustee to review the vendor files; this includes attending to the items listed on the lists we periodically
update and provide.

The Interim Trustee will file a status report next week, so that parties in interest are aware of the status of the Interim Trustee's progress.

The Interim Trustee and I appreciate that Mr. Bergstein has provided a significant amount of information;  however, Mr. Bergstein has
also failed to provide a significant amount of the information requested by the Interim Trustee, and Item Nos. 1-3 require Mr. Bergstein's
immediate attention.

-Leonard Gumport

Leonard L. Gumport
Gumport | Mastan
550 S. Hope St., Ste. 825
Los Angeles, CA 90071-2627
(213) 452-4901

EXHIBIT 1

00015

11/8/2010



FILED
Los Angeles Superior Court

APR 27 2010

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
SHAUNYA WESLEY

1  MITCHELL SILBERBERG & KNUPP LLP
   JEAN PIERRE NOGUES (SBN 84445)
2  LUCIA E. COYOCA (SBN 128314)
   11377 West Olympic Boulevard
3  Los Angeles, California 90064-1683
   Telephone: (310) 312-2000
4  Facsimile: (310) 312-3100

5  Attorneys for Plaintiffs

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF LOS ANGELES

10                       CENTRAL DISTRICT

11 RONALD TUTOR, an individual, DAVID          CASE NO. BC
   BERGSTEIN, an individual; R2D2 LLC, a
12 California limited liability company; CT1    BC436548
   HOLDINGS LLC, a Delaware limited liability
13 company; CAPCO GROUP LLC, a Delaware         Honorable
   limited liability company; CAPCO U.S. FILM
14 HOLDINGS LLC, a Delaware limited liability   COMPLAINT FOR FRAUD, RESCISSION
   company; CAPITOL FILM GROUP LIMITED,        & RESTITUTION, DECLARATORY
15 a United Kingdom limited liability company;  RELIEF, MODIFICATION AND
   CAPCO TF HOLDINGS LLC, a Delaware           RESTITUTION AS TO UNLAWFUL
16 limited liability company; CF               CONTRACTS, AND DAMAGES &
   ACQUISITIONS LLC, a Delaware limited        PENALTIES UNDER CIVIL CODE
17 liability company; TF ACQUISITION           § 1916.12-1 et seq. and CAL. CONST. ART.
   CORPORATION, a Delaware corporation; TF     XV, §1
18 CANADA ACQUISITION CORPORATION, a
   corporation organized under the laws of
19 Ontario, Canada; THINKFILM LLC, a
   Delaware limited liability company; FPLAC
20 LLC, a Delaware limited liability company;
   ZOOPRAXIS FILM ASSETS LLC, a Delaware
21 limited liability company; STOPPING
   POWER PRODUCTIONS LLC, a Delaware
22 limited liability company; BLAC LLC, a
   Delaware limited liability company ;
23 SHERIDAN SQUARE ENTERTAINMENT
   INC., a Delaware Corporation; SSE
24 GUARANTY COMPANY, a Delaware
   Corporation; BT MUSIC LLC, a Delaware
25 limited liability company;

26          Plaintiffs,

27      v.

28 DANIEL B. ZWIRN, an individual, STEVEN

                    EXHIBIT 2                    00016

### FIFTH CAUSE OF ACTION
**(Against All Defendants for Modification and Restitution as to Unlawful Contracts)**

73.    Plaintiffs incorporate herein each and every allegation set forth in paragraphs 1 through 51, inclusive, hereinabove.

74.    Each of the loans alleged hereinabove, including without limitation, the Capitol Loans, the Single Picture Loans identified in paragraph 20, the ThinkFilm Loans, the Sheridan Loan, the BWT Loan, the CT1 Loan and the Stopping Power Loan, is usurious, and the provisions thereof purporting to require Plaintiffs to pay interest are therefore unlawful and void.

75.    According, Plaintiffs are entitled to an order declaiming all interest provision in the aforesaid loans, void and unenforceable, and restoring to Plaintiffs all fees, costs and interest paid by any of Plaintiffs to any of Defendants

### SIXTH CAUSE OF ACTION
**(Against All Defendants for Damages and Penalties Under Civil Code § 1916.12-1 et seq. and Cal. Const. Art. XV, § 1)**

76.    Plaintiffs incorporate herein each and every allegation set forth in paragraphs 1 through 51, inclusive hereinabove.

77.    Plaintiffs are entitled to damages in the full amount of all interest, fees and costs charged to and paid by any of Plaintiffs to any of Defendants under the aforementioned loans.

78.    In addition, Plaintiffs are entitled to trebled damages of all such amounts charged and paid.

### PRAYER FOR RELIEF:

WHEREFORE, Plaintiffs pray as follows:

A.    On the First Cause of Action, for rescission of each and every loan, guaranty, pledge, security agreement and other agreement entered into in reliance on defendants' fraud and misrepresentations as alleged herein;

B.    On the Second Cause of Action,

(i)    For compensatory damages according to proof, and

**COMPLAINT FOR FRAUD, RESCISSION & RESTITUTION, DECL. RELIEF, MODIFICATION AND RESTITUTION, DAMAGES & PENALTIES UNDER CIVIL CODE § 1916.12-1 et seq. and CAL. CONST. ART. XV, §1**

EXHIBIT

00017

**Date: Wed, 06 Oct 2010 15:32:13 -0700**
**From: LENNY (Leonard Gumport)**
**To: dweinstein@hro.com,lec@msk.com,mbarnes@barneslaw.us**
**cc: dahdoot@bushgottlieb.com,dln@lnbrb.com,img@lnbrb.com,jae@imbm.com,**
**jgarfinkle@buchalter.com,jkohanski@bushgottlieb.com,jsc@birdmarella.com**
**Subject: bcc: Thinkfilm & Capitol Films Development Turnover of Privileged Files Demand**

To All Current and Former Counsel for ThinkFilm LLC and Capitol Films Development:

The Bankruptcy Court is entering orders for relief in the ThinkFilm LLC and Capitol Films Development LLC bankruptcy cases.

Pursuant to the orders appointing interim trustees (and Mr. Durkin as interim trustee), he becomes permanent trustee upon entry of the orders for relief.

Please identify all matters on which your firm was is or counsel for ThinkFilm LLC and/or Capitol Films Development LLC during the time period  January 1, 2006 through to the present.

In the meantime, and pending receipt of further information from you, demand is hereby made that you turn over -- and/or permit Mr. Durkin to inspect and copy -- all client files of ThinkFilm LLC and Capitol Films LLC.

Thanks.

Sincerely,

Leonard L. Gumport
Gumport | Mastan
550 S. Hope St., Ste. 825
Los Angeles, CA 90071-2627
(213) 452-4901

EXHIBIT 3                                                        00018

11/8/2010

**Subject: RE: Thinkfilm et al - REDACTED DOCUMENTS - SUBJECT TO
CONFIDENTIALITY ORDER**
**Date: Mon, 8 Nov 2010 17:09:53 -0800**
**From: "Leonard, Christopher" <CBL@msk.com>**
**To: "Leonard Gumport" <lgumport@gumportlaw.com>**
**Cc: "Coyoca, Lucia" <lec@msk.com>,**
**<JAE@JMBM.com>,**
**<jsc@birdmarella.com>**

Dear Mr. Gumport -- Thank you for your understanding.  I will confer with Ms. Coyoca and provide you with a new
proposed date.  Chris

-----Original Message-----
From: Leonard Gumport [mailto:lgumport@gumportlaw.com]
Sent: Mon 11/8/2010 5:00 PM
To: Leonard, Christopher
Cc: Coyoca, Lucia; JAE@JMBM.com; jsc@birdmarella.com
Subject: RE: Thinkfilm et al - REDACTED DOCUMENTS - SUBJECT TO CONFIDENTIALITY ORDER

Dear Mr. Leonard,

I am responding to your email, below.

1. Thanks for confirming that additional documents are available for pickup.  I will pick them up tomorrow.

2. As you promise, please confirm whether the documents that were redacted were properly redacted.

3. I also understand that you are ill and don't want the exam of Ms. Coyoca to proceed tomorrow.

4. Please give me the earliest possible date for when Ms. Coyoca will be made available.

Thanks.

-Leonard Gumport

On Monday, November 08, 2010 1:34 PM, Leonard, Christopher wrote:


Dear Mr. Gumport:

I have taken ill this afternoon and am out of the office.  However, I received your email message about the redactions.  It
is my understanding that the redactions were made to the referenced documents to omit materials that are not part of the joint
privilege for ThinkFilm and/or Capitol Film Development.  I will verify this and get back to you.

We do now have an additional group of documents available for you to pick up.  The documents that are ready bear the
following Bates numbers:

    MSK.42076-1 00149-00189
    MSK.42076-2 00011-62
    MSK-18 16007-17876
    MSK-14 04013-05567

Please have your messenger ask for either Kiersten Stensland or Mari Tamura when they come to pick up these
documents.

Lastly, my condition may or may not preclude me from defending Ms. Coyoca at her voluntary examination tomorrow.
I appear to have come down with a flu bug that sidelined one of my children for most of the weekend.  I am not willing to
have Ms. Coyoca appear at her examination tomorrow without my being present as her counsel.  I will let you know before

**EXHIBIT 4**

00019

11/8/2010

the end of the day whether the examination will need to be rescheduled.

Very truly yours,

Chris Leonard

-----Original Message-----
From: Leonard Gumport [mailto:lgumport@gumportlaw.com]
Sent: Mon 11/8/2010 12:25 PM
To: Leonard, Christopher; Coyoca, Lucia
Cc: JAE@JMBM.com; jsc@birdmarella.com
Subject: Thinkfilm et al - REDACTED DOCUMENTS - SUBJECT TO CONFIDENTIALITY ORDER

Dear Mr. Leonard,

You produced the enclosed documents in redacted form.

Please provide the unredacted versions of these documents before Ms. Coyoca's exam tomorrow at 10 am.

Thanks.

Sincerely,

Leonard L. Gumport
Gumport | Mastan
550 S. Hope St., Ste. 825
Los Angeles, CA 90071-2627
(213) 452-4901

EXHIBIT 4

00020

11/8/2010

Date: Wed, 20 Oct 2010 11:28:21 -0700
From: LENNY (Leonard Gumport)
To: JAE@JMBM.com,tgehrer@jmbm.com
cc: jsc@birdmarella.com,lec@msk.com,rdrukin@durkinforensic.com
Subject: bcc: ThinkFilm et al - Bank of America

Joe & Jen,

Mr. Bergstein is designated as the "Debtor" in each of the five cases.

The Newbury Park branch of Bank of America has not complied with requests of the Trustee to transfer the funds that are deposited there in the names of one or more of the five Debtors.

As you may know, objections have been filed to motions by the Trustee to examine certain current and former BofA representatives.  Perhaps the pendency of those motion and objections have made BofA reluctant to comply with the Trustee's directions.

I request that Mr. Bergstein accompany Mr. Durkin to Bank of America to get all funds on deposit there transferred to new accounts in the Trustee's name.

This needs to be done now so that the Trustee can pay ongoing (nonprofessional) expenses.

Please have Mr. Bergstein arrange a time with Mr. Durkin when the two of them can be at BofA in Newbury Park.

Thanks.

Sincerely,

Leonard L. Gumport
Gumport | Mastan
550 S. Hope St., Ste. 825
Los Angeles, CA 90071-2627
(213) 452-4901

EXHIBIT 5

00021

11/8/2010

**Date: Mon, 25 Oct 2010 11:01:05 -0700**
**From: LENNY (Leonard Gumport)**
**To: jgarfinkle@Buchalter.com,jsc@birdmarella.com**
**cc: dahdoot@bushgottlieb.com,dln@lnbrb.com,JAE@JMBM.com,**
**jkohanski@bushgottlieb.com,lec@msk.com,rfleischer@pryorcashman.com**
**Subject: bcc: Thinkfilm et al - LAAC Threats**

Jeff,

I have double-checked.  The Trustee hasn't used a dime of estate money.  The first turnover of funds took place on Friday, and the Trustee is depositing those funds (approx. $51k) in an estate account.  The Trustee has been paying for estate expenses from his own funds.

The Trustee will only use those funds in accordance with the Bankruptcy Code, and he won't use those funds until I advise him after seeing how you respond -- if at all -- to my demands for all your control agreements and the exam you cancelled of Mr. Tutor.

Please be advised that the Guilds assert that they have senior liens in what you claim is your cash collateral.  Did you know this?  Were you attempting to mislead the Trustee about the validity and priority of the liens?  Were you attempting to divert Guild funds to yourself?  Please provide a candid explanation.

Please produce Mr. Tutor immediately for sworn examination.

Please produce -- or admit you don't have - control agreements concerning the accounts of BofA.

Please respond to my separate email concerning the documents recently obtained by the Trustee.

Sincerely,

Leonard L. Gumport
Gumport | Mastan
550 S. Hope St., Ste. 825
Los Angeles, CA 90071-2627
(213) 452-4901

EXHIBIT 6

00022

11/5/2010

**Subject: RE: ThinkFilm et al _ LAAC**
**Date: Mon, 25 Oct 2010 12:10:01 -0700**
**From: "Garfinkle, Jeffrey K." <jgarfinkle@Buchalter.com>**
**To: "Leonard Gumport" <lgumport@gumportlaw.com>**
**Cc: <dahdoot@bushgottlieb.com>,**
**<dln@lnbrb.com>,**
**<img@bushgottlieb.com>,**
**<JAE@JMBM.com>,**
**<jkohanski@bushgottlieb.com>,**
**<lec@msk.com>,**
**<rfleischer@pryorcashman.com>,**
**<ejones@omm.com>,**
**<jsc@birdmarella.com>**

Leonard:

Thank you for your e-mail.  LAAC, of course, disputes any right of the trustee to
surcharge LAAC's collateral.


*Jeffrey Garfinkle*
*Shareholder*
**BuchalterNemer**, A Professional Corporation
18400 Von Karman Avenue, Suite 800 | Irvine, CA 92612-0514
Direct Dial: (949) 224-6254 | Cell Phone: (949) 500-7696 | Direct Fax: (949) 224-6400 | Switchboard: (949) 760-1121
Email: jgarfinkle@buchalter.com | www.buchalter.com | Bio

-----------------------------------------------------------------------

**From:** Leonard Gumport [mailto:lgumport@gumportlaw.com]
**Sent:** Monday, October 25, 2010 11:27 AM
**To:** ejones@omm.com; Garfinkle, Jeffrey K.; jsc@birdmarella.com
**Cc:** dahdoot@bushgottlieb.com; dln@lnbrb.com; img@bushgottlieb.com; JAE@JMBM.com;
jkohanski@bushgottlieb.com; lec@msk.com; rfleischer@pryorcashman.com
**Subject:** ThinkFilm et al _ LAAC

Jeff,

This is a further response to your frivolous letter dated 10/22/10.

1.  The first turnover of funds made to the Trustee occurred last Friday, consisting of
approximately $51k.

2.  You immediately asserted a priority security interest in those funds, and the Guilds
immediately responded that they had a prior security interest in those funds.  You apparently
chose not to disclose this fact.

3.  You have cancelled Mr. Tutor's Rule 2004 exam, and you have failed to produce any
control agreements between LAAC and BofA.  Zwirn's counsel previously told me that Zwirn (in
whose shoes you purport to stand) never perfected its security interest in any BofA accounts).

4.  No other funds have been received by the Trustee.   The funds that the Trustee does have
will be sequestered until further notice.  You should assume that your client will ultimately be

EXHIBIT 7                                    00023
                                          11/5/2010

surcharged and/or sanctioned for the needless difficulties its lack of cooperation is causing in administering estate assets.

5.  Please disclose all funds directly or indirectly received by your clients and your firm that are proceeds of assets previously directly or indirectly owned by the Debtors.  Please do not represent to anyone that you have obtained the Trustee's consent to divert, encumber, or apply to your own purposes any of those assets or proceeds.

6.  Please tell me when you are going to correct your decision to cancel Mr. Tutor's further Rule 2004 examination.

Thanks.

Sincerely,

Leonard L. Gumport
Gumport | Mastan
550 S. Hope St., Ste. 825
Los Angeles, CA 90071-2627
(213) 452-4901


Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**



EXHIBIT 7

00024

11/5/2010

1   JEFFREY K. GARFINKLE (SBN 153496)
    JOSEPH M. WELCH (SBN 259308)
2   BUCHALTER NEMER
    A Professional Corporation
3   18400 Von Karman Avenue, Suite 800
    Irvine, California 92612
4   Telephone: (949) 760-1121
    Facsimile: (949) 720-0182
5   Email: jgarfinkle@buchalter.com
           jwelch@buchalter.com

6

7   Attorneys for Secured Creditor,
    Library Asset Acquisition Company, Ltd.

8

            **UNITED STATES BANKRUPTCY COURT**

9

            **CENTRAL DISTRICT OF CALIFORNIA**

10

            **LOS ANGELES DIVISION**

11

12   In re

13   ThinkFilm LLC,

14           Debtor.

15

16

17

18

19

20

| | |
|---|---|
| In re<br><br>ThinkFilm LLC,<br><br>       Debtor. | Case No. 2:10-bk-19912-BR<br><br>Chapter: 11<br><br>**LIBRARY ASSET ACQUISITION COMPANY'S MOTION TO: (1) PROHIBIT TRUSTEE FROM USING CASH COLLATERAL; (2) SEQUESTER CASH COLLATERAL AND (3) PROVIDE ACCOUNTING OF ALL POST-PETITION RECEIPTS**<br><br>Date:      [to be scheduled]<br>Time:<br>Ctrm: |

21        Library Asset Acquisition Company ("LAAC"), by and through its undersigned counsel,

22   hereby moves for an order: (1) prohibiting the Chapter 11 trustee ("Trustee") from using cash

23   collateral; (2) requiring the immediate sequestration of all cash collateral; and (3) requiring an

24   accounting of all post-petition receipts (collectively, the "Cash Collateral Sequestration Motion").

25   In support of this Cash Collateral Sequestration Motion, LAAC represents as follows:

26   ///

27

28

# EXHIBIT 8

00025

BN 7486721v1                  1

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
IRVINE

LIBRARY ASSET ACQUISITION COMPANY'S MOTION TO (1) PROHIBIT USE OF CASH
COLLATERAL; (2) SEQUESTER CASH COLLATERAL AND (3) ACCOUNTING

# Deposition of

# EVAN JAMES WARSHAWSKY

## IN RE: THINKFILM, LLC

*Taken On*
*November 3, 2010*

Transcript provided by:

# HUTCHINGS ℠
## COURT REPORTERS, LLC
### CSR 649

GLOBAL LEGAL SERVICES

**800.697.3210**

# EXHIBIT 9

00026

IN RE: THINKFILM, LLC V.    November 3, 2010    EVAN JAMES WARSHAWSKY

**Page 1**

```
1                        CERTIFIED COPY
2           UNITED STATES BANKRUPTCY COURT
3           CENTRAL DISTRICT OF CALIFORNIA
4                  LOS ANGELES DIVISION
5
6   IN RE                    ) BK NO.
                             ) 2:10-BK-19912-BR
7                            )
    THINKFILM, LLC,          )
8                            )
          Alleged Debtor.    )
9   _____)
                             )
10  AND RELATED CASES.       )
    _____)
11
12
13
14     DEPOSITION OF EVAN JAMES WARSHAWSKY, a witness
15     herein, noticed by Gumport Mastan, at
16     550 South Hope Street, Los Angeles, California, at
17     10:01 a.m., on Wednesday, November 3, 2010, before
18     Jana Ruiz, CSR 12837.
19
20     Hutchings Number 287235
21
22
23
24
25
```

**Page 2**

```
1   APPEARANCES OF COUNSEL:
2
3   For THE INTERIM CHAPTER 11 TRUSTEE RONALD L. DURKIN:
4   GUMPORT MASTAN
5   BY LEONARD L. GUMPORT
6   550 South Hope Street, Suite 825
7   Los Angeles, California 90071
8
9   For RONALD N. TUTOR; PANGEA MEDIA GROUP, INC.; and
10  LIBRARY ASSET ACQUISITION CORPORATION:
11  BUCHALTER NEMER
12  BY JEFFREY K. GARFINKLE
13  18400 Von Karman Avenue, Suite 800
14  Irvine, California 92612-0514
15
16
17               I N D E X
18  WITNESS: EVAN JAMES WARSHAWSKY
19  EXAMINATION BY:              PAGE
20  MR. GUMPORT                   4
21
22
23
24
25
```

**Page 3**

```
1                     E X H I B I T S
2   Exhibit identification within the transcript is flagged
    with "[EXH]" as an identifier.
3
4   EXHIBIT    DESCRIPTION          IDENTIFIED  MARKED
5   1          Declaration of          6          48
               Evan Warshawsky
6              [EXH-1]
7   2          Declaration of         40          48
               David Bergstein
8              [EXH-2]
9
10
11
12  Questions the witness refuses to answer are indicated in
    the transcript by a "[QUES]" identifier at the end of
13  the question and are located on the following page(s):
    9, 10, 23, 35, 36
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              EVAN JAMES WARSHAWSKY,
2   a witness herein, having been sworn, testifies as
3   follows:
4
5                  -EXAMINATION-
6
7   BY MR. GUMPORT:
8   Q.  Please state your full name.
9   A.  Evan James Warshawsky.
10  Q.  Please state your date of birth.
11  A.  August 26th, 1959.
12  Q.  Please state your business address.
13  A.  11768 Moorpark Street, Unit J, Studio City,
14  California 91604.
15  Q.  What is the name of your current employer?
16  A.  I'm self-employed currently.
17  Q.  Do you work for anybody?
18  A.  I have clients.  I work as a consultant and
19  have various clients.
20  Q.  Do you understand your under oath?
21  A.  I do.
22  Q.  We're in an informal setting, but everything
23  that you say is going to be taken down by the court
24  reporter.
25      You'll have an opportunity to correct the
```

1 (Pages 1 to 4)

I RE: THINKFILM, LLC V.                       November 3, 2010                       EVAN JAMES WARSHAWSKY

---

**Page 5**

10:02 1  transcript, but to the extent you make changes in the
      2  transcript, it may cast doubt on the accuracy of what
      3  you say today. So it's important that you testify
      4  accurately.
10:02 5      Do you understand that?
      6      A. I do.
      7      Q. Are you under any kind of medication that
      8  affects your ability to remember things or to express
      9  yourself using words?
10:02 10     A. No.
      11     Q. Why don't we have counsel state their
      12  appearances.
      13     I'm Leonard Gumport. I represent Mr. Durkin as the
      14  trustee of various companies in the bankruptcy.
10:03 15     MR. GARFINKLE: Jeff Garfinkle from
      16  Buchalter Nemer on behalf of Library Asset Acquisition
      17  Company.
      18     MR. GUMPORT: This deposition is an examination
      19  being taken in a contested matter involving use of cash
10:03 20  collateral. The confidentiality order doesn't apply to
      21  this proceeding, and other people have been invited to
      22  attend.
      23     MR. GARFINKLE: This is Jeff Garfinkle, and I sent
      24  an e-mail to counsel, including counsel for the guild,
10:03 25  Mr. Kohashki, who may have an interest in the cash

**Page 6**

10:03 1  collateral at issue.
      2     We're taking the deposition under Rule 9014 and not
      3  under Rule 2004, and it is open to any interested party
      4  that would like to attend.
10:03 5     MR. GUMPORT:
      6     Q. Mr. Warshawsky, I'm going to hand you a
      7  document entitled, "Declaration of Evan Warshawsky in
      8  Support of Library Asset Acquisition Company's Motion
      9  to: 1, Prohibit Trustee from Using Cash Collateral; 2,
10:04 10  Sequester cash collateral; and 3, Provide accounting of
      11  all postpetition receipts."
      12     It's got a stamp on it towards the top that
      13  indicates it was filed on October 25, 2010. Please mark
      14  this as Exhibit 1 for identification. [EXH-1]
10:04 15     Take a moment to look at Exhibit 1, Mr. Warshawsky,
      16  and tell me whether you've seen this document before.
      17     A. Yes, I have.
      18     MR. GARFINKLE: And for the record, this document
      19  does not include the exhibits that were attached to
10:04 20  Exhibit 1 when it was filed with the court.
      21     MR. GUMPORT: Mr. Garfinkle, if you click on this
      22  document, this is what downloads, but there is a set of
      23  exhibits, and if Mr. Warshawsky feels the need to refer
      24  to those exhibits, which you separately click on to
10:05 25  download them, they consist of 66 pages, and

**Page 7**

10:05 1  Mr. Warshawsky, I have them here on the table if you
      2  want to look at them at any point during the deposition.
      3     Do you understand that?
      4     THE WITNESS: I do.
10:05 5     MR. GUMPORT:
      6     Q. So with that background, do you recognize
      7  Exhibit 1?
      8     A. Yes, I do.
      9     Q. What is Exhibit 1?
10:05 10     A. It's my declaration in support of Library Asset
      11  Acquisition Company's motion to sequester the cash and
      12  other related items.
      13     Q. And did you sign this declaration on or about
      14  October 25, 2010?
10:05 15     A. I did.
      16     Q. Did you read it before you signed it?
      17     A. Yes, I did.
      18     Q. Now, Mr. Warshawsky, I'm very interested in
      19  your personal knowledge of various events, not what
10:05 20  someone may have told you or you heard in terms of
      21  gossip.
      22     So when you listen to my questions, please
      23  understand that I'm trying to get what you know and not
      24  your speculation or merely something you're repeating
10:06 25  because someone else told you that.

**Page 8**

10:06 1     Do you understand that?
      2     A. Yes.
      3     Q. You mentioned that you have some clients.
      4     Is Library Asset Acquisition Company one of those
10:06 5  clients?
      6     A. Yes.
      7     Q. When did it become one of those clients?
      8     A. In September of this year.
      9     Q. When in September?
10:06 10     A. I don't recall the exact date. It was towards
      11  the beginning of September 2010.
      12     Q. And what were the events that led Library Asset
      13  Acquisition Company to become one of your clients?
      14     MR. GARFINKLE: To the extent that you can answer
10:06 15  that without divulging attorney-client communications,
      16  you're free to answer that.
      17     If it goes to communications with counsel, then I'm
      18  instructing the witness not to answer.
      19     THE WITNESS: I met with Mr. Garfinkle, attorney
10:07 20  for Library Asset Acquisition Company, and he asked me
      21  if I would work with the company and assist them in
      22  various matters relating to their assets and the legal
      23  proceedings involved.
      24     MR. GUMPORT:
10:07 25     Q. Did he offer -- let me rephrase the question.

! (Pages 5 to 8)

EXHIBIT 9

00028

N RE: THINKFILM, LLC V.

November 3, 2010

EVAN JAMES WARSHAWSKY

---

**Page 9**

10:07 1      Did he discuss compensation of you for your

2    services?

3      MR. GARFINKLE: You can answer.

4      THE WITNESS: Yes.

10:07 5      MR. GUMPORT:

6      Q. And what was the compensation that was

7    discussed? [QUES]

8      MR. GARFINKLE: I'm going to object as beyond the

9    scope of the 2000 -- beyond the scope of the motion

10:07 10    before the court, and I'll instruct the witness not to

11    answer.

12      MR. GUMPORT: Can we agree whenever you instruct

13    Mr. Warshawsky not to answer the question, he's deemed

14    to have refused to answer the question based on your

10:07 15    instructions?

16      MR. GARFINKLE: Yes.

17      MR. GUMPORT:

18      Q. And Mr. Warshawsky, is that arrangement

19    satisfactory to you?

10:07 20      A. Yes.

21      MR. GUMPORT: Thank you.

22      Can we have an agreement that you will instruct

23    Mr. Warshawsky to refuse to answer any questions

24    concerning what payments he was to receive for any of

10:08 25    the services he began to render for Library Asset

---

**Page 10**

10:08 1    Acquisition Company beginning in September 2010?

2      MR. GARFINKLE: Yes.

3      Stipulation that we will have is that the terms of

4    Mr. Warshawsky's engagement by Library Asset Acquisition

10:08 5    Company are confidential and are beyond the scope, and

6    my instruction stands as to any of the aspects of his

7    engagement.

8      MR. GUMPORT: The stipulation will be that's your

9    position, not that I agree with it.

10:08 10      MR. GARFINKLE: Of course.

11      MR. GUMPORT:

12      Q. How much have you been paid by Library Asset

13    Acquisition Company since September 1, 2010? [QUES]

14      MR. GARFINKLE: Same objection. Same instruction.

10:08 15      MR. GUMPORT:

16      Q. Now, do you have other clients for whom

17    Mr. Garfinkle's law firm is the lawyer?

18      A. No.

19      Q. Do you have any other clients?

10:09 20      A. Yes.

21      Q. Who are those other clients? [QUES]

22      A. Those clients are in the entertainment or

23    television marketing industries, but they're

24    confidential, as I don't see the relevance for this

10:09 25    examination.

---

**Page 11**

10:09 1      Q. So are you refusing to answer the question?

2      A. Well, in the interest of protecting my clients,

3    the confidentiality of working with those clients, yes.

4      Q. Are any of those clients connected with

10:09 5    Ron Tutor or David Bergstein?

6      A. No.

7      Q. Now, let's return to Exhibit 1. Paragraph

8    number 3 of your declaration at page 2 of your

9    declaration states that you worked with several of the

10:09 10    alleged debtors and related entities during the time

11    period December 2008 to October 2009.

12      Do you see that?

13      A. I do.

14      Q. Who were those entities?

10:10 15      A. Among those entities would be Capitol Films,

16    ThinkFilm, CT-1, Zoopraxis, Capco Group.

17      Q. Were there any other entities that you worked

18    for during that time period?

19      A. I had various interactions, supervision,

10:10 20    oversight, or involvement with most of the entities that

21    were under the control by David Bergstein.

22      Q. Who were those entities?

23      A. I don't know if I could recite a complete list

24    off the top of my head.

10:10 25      Q. Well, were any of those entities Library Asset

---

**Page 12**

10:10 1    Acquisition Company?

2      A. No.

3      At that time, I knew of the formation of Library

4    Asset Acquisition Corporation, but I did not have any

10:10 5    involvement, that I recall, with it during the time I

6    was involved with David Bergstein.

7      Q. Did you ever hear of a company called

8    TFC Library?

9      A. Yes.

10:11 10      Q. Did you have any involvement with TFC Library

11    during the time period December 2008 to October 2009?

12      A. Yes.

13      Q. And what was your involvement with that entity?

14      A. Primarily compiling data on the various titles

10:11 15    that were to be transferred or had been transferred into

16    that company.

17      Q. And when did you do that?

18      A. Sometime in 2009. I don't recall exactly when.

19      Q. Didn't you do that in 2008?

10:11 20      The reason I ask, there's an asset purchase

21    agreement that's an exhibit to a previous declaration of

22    you that's dated as of October 2008.

23      You know that; correct?

24      A. Correct.

10:11 25      Q. Did you compile the titles that are listed in

---

3 (Pages 9 to 12)

00029

EXHIBIT 9

IN RE: THINKFILM, LLC V.                                          EVAN JAMES WARSHAWSKY
November 3, 2010

---

**Page 13**

10:11 1   that asset purchase agreement?
      2       A. No.
      3       I began to work for Mr. Bergstein in December of
      4   2008. That was before the time I worked for
0:12  5   Mr. Bergstein.
      6       Q. Did you see the asset purchase agreement that
      7   you previously submitted to the court in December 2008?
      8       A. Yes.
      9       I've seen it.
0:12 10       Q. Was it signed when you saw it?
     11       A. Yes.
     12       Q. In December 2008, that agreement had been
     13   signed?
     14       A. I don't know when I first saw the agreement.
0:12 15   When I saw it, it had been signed.
     16       Q. Well, let's focus on this.
     17       When did you first see the asset purchase agreement
     18   that you gave to the bankruptcy court with your first
     19   declaration reflecting the transfer of assets from
0:12 20   ThinkFilm and other entities to TFC Library having a
     21   date on the first page of October 2008?
     22       When did you first see that document?
     23       MR. GARFINKLE: And he doesn't want you to
     24   speculate. If you don't know --
0:12 25       MR. GUMPORT: Yeah.

---

**Page 14**

0:12  1       If you don't know, you don't know.
      2       THE WITNESS: I don't recall when I first saw it.
      3       I know that I reviewed it and saw it prior to my
      4   filing in September of 2010. I knew of its existence
0:13  5   prior to that point, but I don't recall seeing that
      6   document before the filing in September of 2010.
      7       MR. GUMPORT:
      8       Q. When you say "before the filing in
      9   September 2010," the filing of what?
0:13 10       A. My declaration.
     11       Q. So that we're clear, the first time you saw the
     12   fully signed asset purchase agreement which had the date
     13   October 2008 on the first page was September 2010; is
     14   that right?
0:13 15       A. That's correct.
     16       I had no cause to have reviewed it prior to that.
     17       Q. But you did work in connection with compiling
     18   titles to be transferred to TFC Library during 2009; is
     19   that right?
0:13 20       A. Yes, that's correct.
     21       Q. What did that compiling work consist of?
     22       A. Well, from time to time while working for
     23   Mr. Bergstein, I was responsible for various financial
     24   aspects, and he would ask me for a list of titles in one
0:14 25   library or another.

---

**Page 15**

10:14 1       I was not always aware what specific purpose he
      2   wanted these items for, but I would provide him whatever
      3   information was requested.
      4       Q. Well, did you understand sometime during 2009
10:14 5   that you were compiling a list of titles to be
      6   transferred from ThinkFilm and its affiliates to
      7   TFC Library?
      8       A. I understood the transfer was taking place. I
      9   was not involved with the specific documentation of that
10:14 10   transfer.
     11       Q. Why would you be compiling titles of films if
     12   there was already a written document, this asset
     13   purchase agreement dated October 2008, that had a list
     14   attached to it spelling out what titles would be
10:14 15   transferred?
     16       A. Like I said, Mr. Bergstein would ask me for
     17   specific pieces of information. He didn't tell me why
     18   or what or when things were needed.
     19       Q. And he didn't at any time show you the asset
10:15 20   purchase agreement dated October 2008 that had a list of
     21   titles attached to it at any time during 2008 through
     22   2009; is that right?
     23       MR. GARFINKLE: If you recall.
     24       THE WITNESS: Not that I recall, but it was not
10:15 25   under my responsibilities at that time.

---

**Page 16**

10:15 1       I was -- I mean, I came in in December of 2008 to
      2   assist with various financial areas and also various
      3   operational issues, administrative and so forth.
      4       So it wasn't something that came up under my
10:15 5   day-to-day responsibilities.
      6       MR. GUMPORT:
      7       Q. Did you do any work during 2008 through 2009
      8   for a company called Library Rights?
      9       A. No.
10:16 10       Q. Did you do any work during 2008 through 2009
     11   for a company called R -- the letter R -- Media,
     12   M-E-D-I-A?
     13       A. No.
     14       Q. Did you do any work for a company called
10:16 15   Intermedia during that time?
     16       A. Yes.
     17       I believe there were various things I did that I --
     18   well, there were several entities that comprised
     19   Intermedia, but if you're talking about Intermedia Film
10:16 20   Distribution, there were things that I had to do.
     21       Q. And what were those things?
     22       MR. GARFINKLE: You can answer.
     23       THE WITNESS: Compile a list of revenues,
     24   investigate payments due, compile lists of rights
10:16 25   available for sale, indirectly supervise the sale of

---

(Pages 13 to 16)

EXHIBIT 9

Page 17

10:16  1  rights and so forth through our sales force.
       2      MR. GUMPORT:
       3      Q. And you understood that company was a company
       4  owned and controlled by whom?
10:17  5      MR. GARFINKLE: If you know.
       6      THE WITNESS: I don't know who the legal owners
       7  were, but I understood that it was a company that was, I
       8  believe, owned at least in part by David Bergstein or
       9  one of his entities.
10:17 10      MR. GUMPORT:
      11      Q. Did you do any work for R2D2 during 2008
      12  through 2009?
      13      A. I knew of the company. I don't believe I did
      14  anything, specifically, for R2D2.
10:17 15      Q. Did you have an understanding at any time
      16  during 2008 through 2009 as to who controlled that
      17  company; namely, R2D2?
      18      A. I believe that company was managed by
      19  David Bergstein.
10:17 20      Q. Did you have any understanding as to who the
      21  owners were of that company during that time?
      22      A. My understanding was that the owners were
      23  Ron Tutor and David Bergstein, but I don't -- I can't
      24  confirm that. That was just my understanding.
10:18 25      Q. And that understanding was based on what, just

Page 18

10:18  1  hundred percent speculation by you or something else?
       2      A. Just reference by the parties.
       3      I hadn't seen the formation documents for the
       4  company. So I can't confirm it.
10:18  5      Q. Well, did Mr. Bergstein tell you at any time
       6  during 2008 through 2009 words that led you to conclude
       7  that he and Mr. Tutor owned R2D2?
       8      A. I believe he referred to himself as either
       9  owner or manager.
10:18 10      I don't think he -- I mean, it was my understanding
      11  Ron Tutor was David Bergstein's partner, but I don't
      12  know what the specific ownership of their entities were
      13  or what percentage or what ownership, what have you.
      14      Q. And how did you get the understanding that
10:18 15  Ron Tutor was David Bergstein's partner, and we're
      16  talking about the time period 2008 through 2009?
      17      A. I had heard Mr. Bergstein refer to Ron as his
      18  partner informally in many areas, but I can't say
      19  legally how that partnership was constructed.
10:19 20      Q. Did Mr. Bergstein at any time tell you that he
      21  had bought out Mr. Tutor's interest in R2D2 and that he
      22  was no longer a partner in R2D2 with Mr. Tutor?
      23      A. No.
      24      But he, typically, did not share those types of
10:19 25  details with me.

Page 19

10:19  1      Q. Go to paragraph 9 on page 3 of your
       2  declaration, please.
       3      You see that paragraph 9 talks about a secured
       4  credit facility involving ThinkFilm and a company I'll
10:20  5  pronounce as FPLAC, spelled F-P-L-A-C, and a company
       6  called Zoopraxis?
       7      You see that?
       8      A. I do.
       9      Q. And it's your understanding that paragraph 9 is
10:20 10  correct; right?
      11      A. Yes, it is.
      12      Q. Did you ever see $29 million at any time during
      13  March 2007 transferred by Zwirn to ThinkFilm?
      14      A. I was not employed by the companies at that
10:20 15  time. So no. That was prior to my term of employment.
      16      Q. Did you ever see $29 million transferred at any
      17  time during March 2007 by anyone to FPLAC at any time
      18  during March 2007?
      19      A. Prior to December 2008, I did not witness
10:21 20  anything personally with regard to any of the entities
      21  or any transactions.
      22      Q. So you obviously didn't see a transfer of
      23  $29 million by anyone to FPLAC in March of 2007;
      24  correct?
10:21 25      A. Correct.

Page 20

10:21  1      Q. And your answer would be the same as to
       2  Zoopraxis as well, Z-O-O-P-R-A-X-I-S; correct?
       3      A. Correct.
       4      Q. Now, let's flash forward to all these books and
10:21  5  records that you've claimed you've read; right?
       6      You're familiar with the records of Library Asset
       7  Acquisition; correct?
       8      A. Correct.
       9      Q. In those books and records, have you seen a
10:22 10  transfer of funds that took place in March of 2007 by
      11  anyone to ThinkFilm?
      12      MR. GARFINKLE: Objection. Assumes facts not in
      13  evidence.
      14      MR. GUMPORT: I know they're not in evidence.
10:22 15      Go ahead.
      16      Q. Have you seen any books and records of LAAC,
      17  Library Asset Acquisition, that you contend you've
      18  carefully examined, showing $29 million was transferred
      19  by anyone to a bank account of ThinkFilm?
10:22 20      MR. GARFINKLE: Counsel, I'm going to object to the
      21  form of the question. It mischaracterizes the
      22  testimony.
      23      You know full well that each of these
      24  transfers went to third parties in connection with
10:22 25  Asset Acquisitions, with ThinkFilm, FPLAC, and --

5 (Pages 17 to 20)

EXHIBIT 9                                    00031

IN RE: THINKFILM, LLC V.                    November 3, 2010                    EVAN JAMES WARSHAWSKY

---

Page 21

10:22 1     MR. GUMPORT: You're testifying now. You're not
2     objecting.
3         MR. GARFINKLE: You're right. You're right.
4         You know, and we have court records in the
10:22 5   bankruptcy court where FPLAC bought a library out of a
6     bankruptcy case called Franchise Pictures, and
7     consideration was paid to Franchise Pictures.
8         If you want to ask records or testimony about
9     what's correct about what the facts were that D.B. Zwirn
10:23 10  and other borrowers -- lenders financed those
11    acquisitions by way of third-party transfers, go ahead.
12        But don't suggest to this witness that somehow they
13    were supposed to have money transferred into FPLAC,
14    because that's complete distortion of the record.
10:23 15      MR. GUMPORT: You're taking up my time, and that is
16    a coaching and suggestive objection and I object to it.
17        Q. Mr. Warshawsky, based on all the records you've
18    reviewed on behalf of your September 2010 client LAAC,
19    Library Asset Acquisition Company, have you seen a
10:23 20  transfer by anyone of $29 million or more that went into
21    a bank account in the name of ThinkFilm, FPLAC, or
22    Zoopraxis?
23        A. As custodian, one of the custodians of LAAC's
24    record, I have seen a transfer of a note and I have seen
10:24 25  a documentation of a note in the amount of $29,650,000.

---

Page 22

10:24 1   I have seen liens that were transferred to LAAC.
2         Q. My question, though -- move to strike.
3     Nonresponsive.
4         I'm asking you whether, in the records that you've
10:24 5   reviewed since becoming engaged as a consultant to LAAC,
6     you have seen a transfer of funds in the amount of
7     $29 million or more that occurred at any time during
8     March 2007 by anyone, Zwirn included, into a bank
9     account of ThinkFilm, FPLAC, and/or Zoopraxis?
10:25 10      MR. GARFINKLE: You can answer the question if you
11    know.
12        THE WITNESS: As LAAC's custodian, the accounting
13    records of ThinkFilm are not part of the records of
14    LAAC.
10:25 15      Previously, as financial consultant and/or chief
16    financial officer for some of the entertainment
17    entities, including ThinkFilm, I have seen these loans
18    recorded on the books of ThinkFilm.
19        MR. GUMPORT: Move to strike as, again,
10:25 20  nonresponsive.
21        Q. Have you seen a transfer of funds in the amount
22    of $29 million or more that occurred March 2007 by Zwirn
23    into a bank account of ThinkFilm?
24        A. I do not recall seeing the specific bank
10:26 25  statement, but I have seen the transaction recorded on

---

Page 23

10:26 1   the books of ThinkFilm prior to September 2010.
2         Q. I'm going to press you on this because I
3     want --
4         MR. GARFINKLE: Object.
10:26 5       MR. GUMPORT: No.
6         Q. First of all, if you listen to the coaching
7     objection of Mr. Garfinkle, there's really no dispute
8     between the two lawyers concerning what the books show
9     concerning the movement of funds.
10:26 10      So I'm going to ask you, how much money do you
11    know, based on your careful review of the books and
12    records, that D.B. Zwirn transferred into the bank
13    account of ThinkFilm in March 2007?
14        Just tell me the number. [QUES]
10:26 15      MR. GARFINKLE: Objection. Asked and answered.
16        MR. GUMPORT: Go ahead.
17        MR. GARFINKLE: Instruct the witness not to answer.
18    Instruction stands.
19        MR. GUMPORT: Okay.
10:26 20      Q. Based on your careful review of the books and
21    records of Library Asset Acquisition, how much money did
22    Zwirn -- and by Zwirn, I'm referring to D.B. Zwirn
23    Special Opportunity Fund -- transfer into the bank
24    account in the name of FPLAC in March 2007?
10:27 25      MR. GARFINKLE: Objection. Asked and answered.

---

Page 24

10:27 1       MR. GUMPORT: You can answer.
2         Q. How much money?
3         MR. GARFINKLE: If you know.
4         THE WITNESS: I am not aware of any specific funds
10:27 5   that were transferred directly to FPLAC.
6         MR. GUMPORT:
7         Q. During March 2007, how much money, if any, was
8     transferred by D.B. Zwirn Special Opportunity Fund into
9     a bank account in the name of Zoopraxis Film Assets?
10:27 10      A. I don't believe there were any funds
11    transferred directly to Zoopraxis. They were simply
12    among the funds that were pledged as collateral as part
13    of loans made to ThinkFilm and other entities.
14        Q. Have you reviewed the bank account records of
10:27 15  Susan Tregub's bank accounts, T-R-E-G-U-B?
16        A. I've seen them. I haven't reviewed them in
17    detail.
18        Q. Did any of the Zwirn money go into any of
19    Susan Tregub's bank accounts at Bank of America?
10:28 20      A. It may have.
21        There were many transactions that were transferred
22    into her account and then transferred out to other
23    accounts.
24        Q. And of the money that went into Susan Tregub's
10:28 25  client trust account, did any of that money go to

---

(Pages 21 to 24)

N RE: THINKFILM, LLC V.

November 3, 2010

EVAN JAMES WARSHAWSKY

Page 25

10:28 1  casinos in Las Vegas?
2       A. I'm not aware.
3       Q. You don't have any idea?
4       A. It -- no.
10:28 5       Q. So you didn't see whether there were any
6  references in these bank statements that you reviewed of
7  Susan Tregub's client trust account to transfers to
8  entities named the Wynn or the Mandalay or the Venetian?
9       You didn't notice that?
10:29 10      A. I haven't seen bank statements.
11       I've seen Excel spreadsheets, and the Excel
12  spreadsheets that I was given while I was employed by
13  Mr. Bergstein were for the operating entities CT-1,
14  ThinkFilm, Capco, et cetera.
10:29 15      Q. So he didn't give you the spreadsheets for
16  Ms. Tregub's client trust account?
17       A. No, he did not.
18       Q. But you did get some bank statements for
19  ThinkFilm; correct?
10:29 20      A. I had access to them. I did not review them in
21  detail.
22       Q. Now, if you'll look down to paragraph number 11
23  at page 3 of your declaration, which is Exhibit 1, do
24  you see that paragraph talks about amendments to the
10:29 25  ThinkFilm credit agreement that increased it to

Page 26

10:30 1  $45,700,000?
2       Do you see that?
3       A. I see that.
4       Q. And tell me whether you have seen bank records
10:30 5  showing transfers of $45 million by D.B. Zwirn Special
6  Opportunities Fund into a bank account in the name of
7  ThinkFilm at any time?
8       A. No.
9       I've seen the notes, and I've seen the liens
10:30 10  recorded.
11       I have not seen the specific funds and what
12  accounts they were transferred into, specifically.
13       Q. So for all you know, David Bergstein could have
14  taken the money and spent it on artwork or casinos?
10:30 15      You wouldn't know; isn't that right?
16       A. For all I know, he could have spent it on the
17  acquisition of ThinkFilm and movie properties and other
18  business-related expenditures.
19       Q. Because you have no idea?
10:30 20      A. No.
21       I just know the existence of the notes.
22       Q. And that would be true for any dollar amount
23  you have in this declaration, you don't know, in other
24  words, what entity actually received the money, if there
10:31 25  was money, and what was done with that money, if

Page 27

10:31 1  anything; correct?
2       A. I know that some of the funds, if you are
3  referring to all the D.B. Zwirn loans?
4       Q. Yes.
10:31 5       A. I know, for instance, the Black Water Transit
6  funds were used to produce "Black Water Transit."
7       I know that the Stopping Power loan was used for
8  expenses related to that project, which was never
9  produced.
10:31 10      And I know that the ThinkFilm loan was used, at
11  least in part, for the acquisition of ThinkFilm in
12  October of 2006.
13       Q. Oh, well, the acquisition of ThinkFilm, you're
14  talking about ThinkFilm, a Canadian company; right?
10:32 15      A. Correct.
16       Q. And into what bank accounts did that money go?
17       A. I wasn't present at the time of the
18  transaction. So I don't know what mechanism was used to
19  transfer funds to the seller or what have you, but I
10:32 20  know that these notes were created and the liens were
21  recorded against these transactions.
22       Q. Do you know into whose bank accounts the money
23  went in connection with the ThinkFilm transaction?
24       A. I believe I already stated I don't.
10:32 25      Q. Now, you mention that there's a company called

Page 28

10:33 1  Capco; right?
2       A. Correct.
3       Q. And have you seen any copyright mortgages
4  recorded against Capco, a company called Capco, by
10:33 5  anybody?
6       A. Specific copyright mortgages?
7       Q. Yeah.
8       A. I don't recall.
9       I know there were copyright filings against FPLAC
10:33 10  and Zoopraxis assets. I don't recall if Capco was
11  specifically in that group or not.
12       Q. Well, I really want you to focus on my
13  question, because I wasn't asking about FPLAC or
14  Zoopraxis. I'm asking you about Capco.
10:33 15      Do you remember seeing a copyright mortgage filing
16  against Capco in favor of anybody?
17       A. I don't recall off the top of my head.
18       Q. How about looking at your declaration and
19  focusing on the question.
10:34 20      Do you recall such a filing?
21       MR. GARFINKLE: Objection. Asked and answered.
22       MR. GUMPORT: The response was, "Off the top of my
23  head." I don't want just off the top of his head. I
24  want him focusing on his declaration and telling me his
10:34 25  best recollection.

7 (Pages 25 to 28)

EXHIBIT 9                    00033

**Page 29**

10:36 1    THE WITNESS: I guess I hadn't recalled the
2    specific company that the copyright mortgages referred
3    to, but I did see the copyright mortgage referred to in
4    paragraph 14 of my declaration that was filed and
10:36 5    perfected security interest against Capco.
6    MR. GUMPORT: Well, you're talking about
7    paragraph 14. What I see in paragraph 14 is a reference
8    to a UCC financing statement.
9    THE WITNESS: Was that not what you were referring
10:36 10    to?
11    MR. GUMPORT: No.
12    That's not what I'm referring to. I'm referring to
13    a copyright mortgage filing with the United States
14    copyright.
10:36 15    Q. Do you understand that there's a difference
16    between a UCC financing statement filing with the
17    secretary of state and the filing of a copyright
18    mortgage with the United States Copyright Office?
19    MR. GARFINKLE: Objection. Calls for a legal
10:37 20    conclusion.
21    MR. GUMPORT:
22    Q. Just asking you whether you know whether
23    there's a difference between the two?
24    A. I understand that there's a difference between
10:37 25    the two.

**Page 30**

10:37 1    Q. So now going back to your comment about
2    paragraph 14, your paragraph 14, I think we can agree,
3    refers to a UCC financing statement filed with the
4    Delaware Secretary of State and does not refer to a
10:37 5    copyright mortgage filing with the United States
6    Copyright Office; correct?
7    A. Correct.
8    Q. Do you recall ever seeing a copyright mortgage
9    filing against Capco at any time with the United States
10:37 10    Copyright Office?
11    A. My understanding is that the copyright
12    mortgages are against specific film titles. I wasn't
13    aware of the copyright mortgage being specifically
14    against Capco.
10:38 15    The copyright mortgages in regards to my
16    declaration were against four films, "The In-Laws",
17    "A Sound of Thunder", "Ballistic: Ecks vs. Sever", and
18    "The Whole Ten Yards."
19    Q. So back to my question, do you recall seeing a
:0:38 20    copyright mortgage filing against Capco with the
21    United States Copyright Office at any time?
22    A. No.
23    Q. Now, do you know who the original owner of the
24    copyright "The In-Laws" was when that movie was first
10:38 25    distributed?

**Page 31**

10:38 1    A. Franchise Pictures, I believe.
2    Q. And have you ever seen the copyright filings
3    that were made concerning "The In-Laws" when
4    Franchise Pictures owned that copyright?
10:39 5    A. No.
6    Q. Did you look to see whether or not any of the
7    motion picture guilds had recorded any copyright
8    mortgages against "The In-Laws" at the time
9    Franchise Pictures owned that film?
10:39 10    A. My understanding was that there was an overall
11    lien from the guilds on the pictures acquired by FPLAC
12    from Franchise and the connection with the deal with
13    FPLAC to purchase those films out of the
14    Franchise Picture bankruptcy, and my understanding —
10:39 15    and I have seen the document -- that that lien was later
16    released by the guilds.
17    Q. Did you check to see whether there were any
18    other liens of record against "The In-Laws" when that
19    copyright was owned by Franchise Pictures?
10:40 20    A. My understanding was that at the time the
21    pictures were purchased by FPLAC through the
22    Franchise Pictures bankruptcy, the guild liens were
23    the only liens that survived the bankruptcy.
24    Q. And what about "A Sound of Thunder," did you
10:40 25    look for copyright mortgage filings that have been made

**Page 32**

10:40 1    against that film -- well, let me rephrase the question.
2    Do you know who owned the copyright to "A Sound of
3    Thunder" prior to its acquisition by a Bergstein
4    company?
10:41 5    A. My understanding was that all four of those
6    films were previously owned by Franchise Pictures and
7    were all transferred or purchased by FPLAC out of the
8    Franchise Pictures bankruptcy.
9    Q. And do you have an understanding that there was
10:41 10    some kind of distribution agreement concerning those
11    films made with Warner Bros.?
12    A. Yes.
13    Q. And is it your understanding that those
14    distribution agreements provided for payment of any
10:41 15    distribution fees to be made into a bank account in the
16    name of Capco?
17    A. Yes.
18    Q. Do you know the reason for that?
19    Do you understand what I'm getting at?
10:41 20    I mean, if FPLAC or somebody else owns the motion
21    picture, why is Warner Bros. being told send the money
22    to Capco?
23    And I'm asking you for what information you have on
24    that.
10:42 25    A. I believe Capco was involved in some way of the

(Pages 29 to 32)

N RE: THINKFILM, LLC V.

November 3, 2010

EVAN JAMES WARSHAWSKY

**Page 33**

| | |
|---|---|
| 10:42 | 1 |
| | 2 |
| | 3 |
| | 4 |

10:42 1   oversight of the affairs of FPLAC, but I don't know the
2   specific reason why that particular account was chosen
3   as being the recipient of those funds.
4     Q. Do you have any idea?
10:42 5     A. No.
6     That decision was made by Mr. Bergstein.
7     Q. Did you ask Mr. Bergstein why the decision was
8   made to do things that way?
9     A. No.
10:42 10     Q. Well, have you checked with Warner Bros. to see
11   why it is that FPLAC-owned films are having their
12   distribution revenues paid into a Capco bank account?
13     A. No.
14     Q. Do you have any idea as to why that's being
10:42 15   done?
16     A. Nothing but speculation.
17     Q. Have you talked to your client LAAC about that
18   arrangement?
19     A. No.
10:43 20     Q. Do you know whether your client LAAC is
21   collecting revenues on other motion pictures that FPLAC
22   acquired from Franchise Pictures?
23     A. No.
24     I have not been asked to comment on that or look
10:43 25   into that at this point.

**Page 35**

10:44 1     A. His personal assistant.
2     Q. Who is his personal assistant?
3     A. Her name is Heather. I forget her last name.
4     Q. Who else?
10:44 5     A. That's all.
6     Q. And have they given you the contracts which
7   Warner Bros. is the other party to the contract?
8     A. Yes.
9     I've seen the Warner Brother distribution
10:45 10   agreements.
11     Q. Has any other money come into LAAC from any
12   source? [QUES]
13     MR. GARFINKLE: Objection. Beyond the scope.
14   Instruct not to answer.
10:45 15     MR. GUMPORT:
16     Q. Has any money come in from any Zoopraxis films
17   to LAAC?
18     MR. GARFINKLE: You can answer the question.
19     THE WITNESS: I don't believe any cash has come
10:45 20   into LAAC during the time that I've been consultant to
21   LAAC.
22     MR. GUMPORT:
23     Q. And do you know why?
24     A. No.
10:45 25     I don't know why.

**Page 34**

10:43 1     Q. Have you looked into it?
2     A. No.
3     Q. Have you gotten any information relating to
4   that?
10:43 5     A. The information I have gotten so far was to
6   look into these four pictures, specifically; to look at
7   the underlying distribution agreements, specifically; to
8   assess the security or collateral held by LAAC and
9   determine if the cash distributed by Warner Bros. in
10:43 10   association with these pictures was part of that
11   collateral.
12     Q. And who told you to do these things?
13     A. I was instructed by counsel for LAAC.
14     Q. That's Mr. Garfinkle?
10:44 15     A. Yes.
16     Q. Did anyone else give you those instructions?
17     A. No.
18     Q. Did anyone at LAAC consult with you about those
19   instructions?
10:44 20     I mean, have you had any client contact, or are you
21   just -- is your sole contact Mr. Garfinkle?
22     A. My primary contact is Mr. Garfinkle. I've had
23   some contact with other representatives of Mr. Tutor.
24     Q. And who are those other representatives of
10:44 25   Mr. Tutor?

**Page 36**

10:45 1     Q. Do you know how LAAC manages to pay you
2   anything? [QUES]
3     MR. GARFINKLE: Objection. Beyond the scope.
4   Instruct not to answer.
10:45 5     MR. GUMPORT:
6     Q. Do your compensation payments come from
7   LAAC? [QUES]
8     MR. GARFINKLE: Same objection. Same instruction.
9     MR. GUMPORT:
10:46 10     Q. Have you talked to anybody at Image?
11     A. During what period?
12     Q. During the summer of 2010.
13     A. I have spoken to various people in Image in
14   contact in relation to other matters in early, I don't
10:46 15   know, summer of 2010. I think the last contact I had
16   was May, April or May.
17     Q. Did you discuss Mr. Bergstein with anybody at
18   Image during 2010?
19     A. I'm sure the topic came up informally.
10:46 20     Q. And who did you talk to about Mr. Bergstein
21   during 2010 at Image?
22     A. I had conversations with Michael Bayer, their
23   chief counsel.
24     Q. Would you spell that, please, Bayer.
10:46 25     A. Bayer, B-A-Y-E-R.

9 (Pages 33 to 36)

EXHIBIT 9

00035

Page 37

10:47 1    Q. And do you remember what you said to Mr. Bayer
2    on the subject of Mr. Bergstein?
3    A. Generally, not specifically, but Mr. Bayer
4    would call me up every now and then and ask if I'd seen
10:47 5    the latest "Hollywood Reporter" article on the ThinkFilm
6    and Capitol Films bankruptcies.
7    And he would talk and I'd listen, and it was more
8    of a collegial-type discussion, not a business
9    discussion.
10:47 10    Q. Were the words "shell game" ever used in these
11    discussions between you and Mr. Bayer?
12    A. I don't recall.
13    Q. Well, wouldn't you recall if you didn't say it?
14    A. I don't believe I said those words.
10:47 15    Q. Did Mr. Bayer say those words?
16    MR. GARFINKLE: Objection. Hearsay.
17    MR. GUMPORT:
18    Q. Did Mr. Bayer say that Mr. Bergstein was
19    operating a shell game?
10:47 20    A. He may have. I don't recall.
21    Q. Wouldn't you remember that if he said it?
22    A. Not necessarily.
23    Q. Did you offer Mr. Bayer to provide Mr. Bayer
24    with information about how Mr. Bergstein did business?
10:48 25    A. I told Mr. Bayer what I would tell anybody, if

Page 38

10:48 1    asked. I would tell the truth.
2    Q. Well, did you tell him the truth about
3    Mr. Bergstein and how he did business when you had
4    discussions with him?
10:48 5    A. I don't believe I disclosed anything
6    confidential, but you know, we had discussions.
7    He asked about the Image agreements, about various
8    things that I -- I don't recall all the specifics of the
9    conversations, but I know that in those conversations, I
10:48 10    said if he needed me to -- if they wanted to depose me
11    or testify, I would tell the truth about what I knew.
12    Q. And did you tell him you knew the truth about
13    the financial problems at Mr. Bergstein's companies?
14    A. I don't think there was a discussion about
10:49 15    reference to financial problems.
16    I think Image was primarily concerned about an
17    advance they had paid for $5 a day and about the overall
18    agreements and Mr. Bergstein's desire to terminate the
19    agreements because he felt Image had not performed
10:49 20    properly, and that's the extent to which I could testify
21    to for Image.
22    I don't believe at that time, in the discussions I
23    had -- and most of these discussions were early in 2010,
24    and then after that, many of the discussions with
10:49 25    Mr. Bayer were with regard to another project entirely,

Page 39

10:50 1    which has nothing to do with this matter.
2    Q. Well, did you tell Mr. Bayer in these
3    discussions in 2010 why you were no longer working for
4    Mr. Bergstein's companies?
10:50 5    A. My pay had been reduced and I could no longer
6    afford to work for Mr. Bergstein, and I got another job.
7    Q. Did you explain to Mr. Bayer why your pay had
8    been reduced by Mr. Bergstein?
9    A. I don't recall specifically discussing it, just
10:50 10    the fact of it was. He could draw his own conclusions.
11    Q. Well, did you permit Mr. Bayer to draw the
12    conclusion that Mr. Bergstein had simply reduced your
13    salary for no reason, or did you tell him your salary
14    had been reduced because the company lacked the money to
10:50 15    pay you what you were entitled to?
16    A. I don't recall the specific discussion.
17    Q. Do you recall generally the discussion
18    explaining to Mr. Bayer that you had left because you
19    weren't being paid the full amount that you were
10:51 20    entitled to?
21    A. I don't understand what this has to do with the
22    cash collateral question.
23    MR. GARFINKLE: You can answer the question.
24    MR. GUMPORT: Well, answer the question, please.
10:51 25    MR. GARFINKLE: You can answer this question.

Page 40

10:51 1    It's getting somewhat far afield from the cash
2    collateral --
3    THE WITNESS: I had considered Mr. Bayer a friend
4    at the time. I think I was commiserating over my
10:51 5    circumstance and situation, and that was the extent of
6    it.
7    MR. GUMPORT:
8    Q. Now, let's mark as Exhibit 2 the declaration of
9    David Bergstein that is dated -- or file dated
10:51 10    November 2, 2010. It's entitled "Declaration of
11    David Bergstein Re Creditor List of Alleged Debtor," and
12    that was filed in the CT-1 Holdings case
13    yesterday. [EXH-2]
14    And I'll give you a copy and ask you whether you've
10:52 15    ever seen this document before.
16    A. No, I have not.
17    Q. If you would open it, please, and I'll
18    represent to you it's a copy of a document I received
19    yesterday.
10:52 20    And if you would go to the page with the paragraph
21    number 38 on it, please, and it has your name,
22    Evan Warshawsky, there.
23    A. I don't see a paragraph 38.
24    Q. Well, keep going.
10:53 25    MR. GARFINKLE: It's the exhibit.

0 (Pages 37 to 40)

EXHIBIT 9

00036

N RE: THINKFILM, LLC V.

November 3, 2010

EVAN JAMES WARSHAWSKY

---

**Page 41**

10:53 1   THE WITNESS: Paragraph 38 or line 38?
2   MR. GUMPORT: Line 38, whatever.
3   THE WITNESS: Okay.
4   MR. GUMPORT:
10:53 5   Q. You see the number 38 and your name next to it?
6   A. Yes, I do.
7   Q. And is that your correct address next to your
8   name?
9   A. Yes, it is.
10:53 10   Q. And are you owed $20,000 by CT-1 Holdings?
11   A. Yes, I am.
12   Q. And were you owed that amount as of March 17,
13   2010?
14   A. Yes, I was.
10:53 15   Q. And how did it come to pass that you were owed
16   that amount by CT-1 Holdings as of March 17th, 2010?
17   A. Because for the last month or so of my
18   employment by Mr. -- or at that point, it was a
19   consulting arrangement with Mr. Bergstein -- I had not
10:53 20   been paid.
21   Q. And how many weeks work did that represent?
22   A. That was approximately eight weeks of work.
23   Q. And were you a contractor or an employee or a
24   consultant, something else, during that eight weeks that
10:54 25   you weren't paid for?

---

**Page 42**

10:54 1   A. During that period, I was a consultant.
2   Q. And what company were you a consultant to?
3   I know it says CT-1 Holdings here, but my question
4   is, which company did you understand owed you the money?
10:54 5   A. CT-1.
6   I had -- as I said, I did work for various of the
7   entities, but my understanding was that at that point,
8   everything was managed by CT-1.
9   Q. So did you have a written agreement with CT-1
10:54 10   that said it was the only company responsible for
11   payment of your services?
12   A. No.
13   Q. And do you know who paid for your services
14   while you worked for the various companies referred to
10:55 15   in your declaration?
16   A. I received payments from CT-1.
17   I believe I also received -- as an employee, I
18   received payments from PES, and I've also received
19   payments from Capco.
10:55 20   Q. Was there any rhyme or reason as to what
21   company paid you your money for your services?
22   A. There may have been, but Mr. Bergstein managed
23   the bank accounts and it wasn't part of my
24   responsibilities.
10:55 25   Q. So whatever the rhyme or reason was for who

---

**Page 43**

10:55 1   paid you your compensation when you worked for
2   Bergstein-managed companies, you're not privy to what
3   that rhyme or reason was; correct?
4   A. Correct.
10:56 5   Q. Are you still owed that $20,000?
6   A. Yes.
7   Q. Do you know how security interest is perfected
8   in deposit accounts?
9   MR. GARFINKLE: Objection. Calls for a legal
10:56 10   conclusion.
11   MR. GUMPORT: I know, I know, but I'm asking him
12   because he talks about perfection.
13   Q. Do you know how a security interest is
14   perfected in deposit accounts?
10:56 15   A. Generally.
16   I've never made a filing myself.
17   Q. Well, is it your testimony that the way one
18   perfects a security interest in a deposit account is by
19   some kind of filing?
10:56 20   MR. GARFINKLE: Objection. Relevance. Objection.
21   Calls for a legal conclusion.
22   MR. GUMPORT: You can answer.
23   MR. GARFINKLE: If you know. Don't speculate.
24   THE WITNESS: No.
10:57 25   I don't know the specific mechanism.

---

**Page 44**

10:57 1   MR. GUMPORT:
2   Q. Do you know how a security interest is
3   perfected in a copyright?
4   A. Yes.
10:57 5   Q. How is a security interest perfected in a
6   copyright?
7   A. Specifically with a copyright mortgage
8   statement filing and generally by a UCC filing, and my
9   understanding is that also that the UCC filing covers
10:57 10   the general assets of any company in addition to the
11   specific filings for the specific asset.
12   Q. Do you know how a security interest is
13   perfected in a contract?
14   MR. GARFINKLE: Objection. Calls for a legal
10:57 15   conclusion.
16   THE WITNESS: Depends on the contract.
17   MR. GUMPORT:
18   Q. Well, do you know how a security interest is
19   perfected in a contract to distribute a copyright in
10:57 20   property?
21   MR. GARFINKLE: Objection. Calls for a legal
22   conclusion.
23   If you know. If you don't, don't speculate.
24   THE WITNESS: In a copyrighted property, copyright
10:58 25   mortgage statement is filed and a UCC filing is also

---

11 (Pages 41 to 44)

00037

EXHIBIT 9

IN RE: THINKFILM, LLC V.
November 3, 2010
EVAN JAMES WARSHAWSKY

Page 45

10:58  1   filed, generally, to cover the overall assets of a
2   company.
3       MR. GUMPORT:
4       Q. Well --
10:58  5       A. And then within that UCC filing, you're allowed
6   to state to what extent the UCC filing encompasses some
7   or all of the assets of a company.
8       Q. Well, to be perfected in a distribution
9   agreement related to a copyrighted film, does the
10:58 10   secured creditor have to file something with the
11  copyright office concerning the distribution agreement?
12      MR. GARFINKLE: Objection. Calls for a legal
13  conclusion.
14      THE WITNESS: Typically.
10:58 15      MR. GUMPORT:
16      Q. When you say "typically," my question is, do
17  you know whether that's a requirement or not, a legal
18  requirement?
19      MR. GARFINKLE: Objection. Calls for a legal
10:59 20  conclusion.
21      THE WITNESS: In order to perfect the security
22  interest, I believe that a copyright mortgage statement
23  filing is required.
24      MR. GUMPORT:
10:59 25      Q. Well, as to Capco, have you seen a copyright

Page 46

10:59  1   mortgage filing on any assets of Capco?
2       MR. GARFINKLE: Objection. Asked and answered.
3       MR. GUMPORT:
4       Q. Just want to be clear, have you seen a
10:59  5   copyright mortgage filing on any assets of Capco?
6       MR. GARFINKLE: Objection. Asked and answered.
7       THE WITNESS: The copyright mortgage that was filed
8   was against FPLAC's assets.
9       I don't believe the copyright mortgage and
11:00 10  assignment was filed against Capco's assets.
11      MR. GUMPORT: For the purposes of this exam, within
12  the scope of this contested matter, Mr. Warshawsky, I
13  don't have any further questions for you.
14      Mr. Garfinkle, the floor is yours.
11:00 15      Do you have any questions?
16      MR. GARFINKLE: No.
17      MR. GUMPORT: Off the record for a moment.
18      (Interruption in proceedings.)
19      MR. GUMPORT: Here is my proposal for the signing
11:02 20  and correction of the transcript, which I'm going to be
21  asked to expedited, and by expedited, I mean in my
22  office this Friday.
23      The court reporter's going to send me a certified
24  copy. The original will be sent to Mr. Garfinkle's
11:02 25  office.

Page 47

11:02  1   Within 30 days from Mr. Garfinkle's actual receipt
2   of the transcript, you, Mr. Warshawsky, will have the
3   right and opportunity to make any changes that you think
4   are necessary or appropriate to make the transcript
11:02  5   accurate and correct, and you'll make those changes by
6   interlineation using ink and initialling each change in
7   the transcript.
8       And then at the end, within the same 30-day time
9   period, you'll sign the transcript at the end -- a
11:03 10  notary seal is waived -- and cause the original
11  transcript, duly-signed and corrected, to be returned to
12  my office.
13      If for any reason within that 30-day time period
14  all of those events don't occur -- that is, your review,
11:03 15  the signing, the return of the transcript -- I can use
16  an unsigned certified copy as though it were a
17  duly-signed original.
18      THE WITNESS: I understand.
19      MR. GUMPORT: Also, the court reporter is relieved
11:03 20  of any obligations she may have to maintain custody of
21  the original transcript.
22      Further, we have a hearing coming up in a very
23  short period of time where I'm going to be using the
24  expedited certified copy.
11:03 25      You will have the right during that time period and

Page 48

11:03  1   in response to anything I file to say this transcript
2   isn't accurate. You won't be obligated to do that, but
3   you'll have the right to that, and Mr. Garfinkle will as
4   well.
11:04  5       But I will be using the uncorrected certified copy
6   during that time period so that you may have the full 30
7   days, but also an opportunity to object to any
8   inaccuracies in the transcript that I do use.
9       Is that acceptable?
11:04 10      MR. GARFINKLE: It's acceptable.
11      MR. GUMPORT: Mr. Warshawsky, is that acceptable to
12  you?
13      THE WITNESS: Yes.
14      MR. GUMPORT: Thank you very much.
11:04 15      Off the record.
16      THE REPORTER: Did you want a copy?
17      MR. GARFINKLE: No.
18      (Whereupon the documents referred to are marked by
19  the reporter as Exhibits 1 through 2 for
20  identification.)
21      (The proceedings concluded at 11:04 a.m.)
22      (Signature on following page.)
23
24
25

2 (Pages 45 to 48)

EXHIBIT 9

00038

IN RE: THINKFILM, LLC V.                                                                    EVAN JAMES WARSHAWSKY
November 3, 2010

                                                                        Page 49

1                          ***

2

3          I declare under penalty of perjury under the laws

4    of the State of California that the foregoing is true

5    and correct.

6

7          Executed at _____, California,

8    on _____.

9

10

11          _____
                  EVAN JAMES WARSHAWSKY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        Page 50

1     I, Jana Ruiz, CSR 12837, do hereby declare:

2         That, prior to being examined, the witness named in
      the foregoing deposition was by me duly sworn pursuant

3     to Section 30(f)(1) of the Federal Rules of Civil
      Procedure and the deposition is a true record of the

4     testimony given by the witness.

5         That said deposition was taken down by me in
      shorthand at the time and place therein named and

6     thereafter reduced to text under my direction.

7     _____ That the witness was requested to review the
              transcript and make any changes to the

8             transcript as a result of that review
              pursuant to Section 30(e) of the Federal

9             Rules of Civil Procedure.

10    _____ No changes have been provided by the witness
              during the period allowed.

11

12    _____ The changes made by the witness are appended
              to the transcript.

13    _____ No request was made that the transcript be
              reviewed pursuant to Section 30(e) of the

14            Federal Rules of Civil Procedure.

15        I further declare that I have no interest in the
      event of the action.

16

17        I declare under penalty of perjury under the laws
      of the United States of America that the foregoing is
      true and correct.

18

19        WITNESS my hand this _____ day of

20    _____, _____.

21    _____
      Jana Ruiz, CSR 12837

22

23

24

25

                                                                        13 (Pages 49 to 50)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

EXHIBIT 9                                                                    00039

| In re: CAPCO GROUP, LLC, | CHAPTER:   11 |
|---|---|
| Alleged Debtor(s). | CASE NUMBER: 2:10-bk-19929-BR |

* **NOTE:** When using this form to indicate service of a proposed order, **DO NOT** LIST ANY PERSON OR ENTITY IN Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

Gumport | Mastan, 550 S. Hope Street, Suite 825, Los Angeles, CA  90071

A true and correct copy of the foregoing document described as: **OPPOSITION OF TRUSTEE TO MOTION OF LIBRARY ASSET ACQUISITION COMPANY LTD.  TO PROHIBIT TRUSTEE FROM USING CASH COLLATERAL; (2) SEQUESTER CASH COLLATERAL AND (3) PROVIDE ACCOUNTING OF ALL POST-PETITION RECEIPTS; STAY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONALD L. DURKIN AND LEONARD L. GUMPORT; AND EXHIBITS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(S) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **November 9, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addresses indicated below:

                                                    **X**  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On **November 9, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.  Listing the judge here  constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

                                                    **X**  Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows:.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

                                                    ___ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 9, 2010 | TRAVIS MICHAEL TERRY | |
|---|---|---|
| Date | Type name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                          F 9013-3.1

| In re: CAPCO GROUP, LLC, | | CHAPTER: 11 |
|---|---|---|
| | Alleged Debtor(s). | CASE NUMBER: 2:10-bk-19929-BR |

**ADDITIONAL SERVICE INFORMATION (if needed):**

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

| | |
|---|---|
| David E Ahdoot | dahdoot@bushgottlieb.com, tjimines@bushgottlieb.com |
| Todd M Arnold | tma@lnbrb.com |
| Jennifer S Chang | jsc@birdmarella.com, krw@birdmarella.com |
| Russell Clementson | russell.clementson@usdoj.gov |
| Leslie A Cohen | leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com |
| James A Dumas | jdumas@dumas-law.com |
| Joseph A Eisenberg | jae@jmbm.com |
| Jeffrey K Garfinkle | bkgroup@buchalter.com, jgarfinkle@buchalter.com; lgoodwin@buchalter.com |
| Philip A Gasteier | pag@lnbrb.com |
| Thomas M Geher | tmg@jmbm.com |
| Irving M Gross | img@lnbrb.com, angela@lnbrb.com |
| Leonard L Gumport | lgumport@grlegal.com |
| Michael C Heinrichs | mheinrichs@omm.com |
| Joseph A Kohanski | jkohanski@bushgottlieb.com, tjimines@bushgottlieb.com |
| Peter J Mastan | pmastan@grlegal.com |
| Hayes F Michel | hmichel@bakerlaw.com |
| David L. Neale | dln@lnbrb.com |
| Andrew S. Rotter | arotter@grlegal.com |
| Mark M Sharf | mark@sharflaw.com, msharf00@gmail.com |
| Ronald M St Marie | rstmarie@dollamir.com, kfulsher@dollamir.com; jhamill@dollamir.com |
| United States Trustee (LA) | ustpregion16.la.ecf@usdoj.gov |
| Joseph M Welch | jwelch@buchalter.com |

**SERVED BY EXPRESS MAIL**

**INTERIM TRUSTEE**
Ronald L. Durkin, CPA
Durkin Forensic Incorporated
601 S. Figueroa Street, Suite 2080
Los Angeles, CA  90017

**OFFICE OF THE U.S. TRUSTEE**
Russell Clementson, Esq.
Office of the U.S. Trustee
Ernst & Young Plaza
725 South Figueroa Street, 26th Floor
Los Angeles, CA  90017

**SERVED BY FEDERAL EXPRESS**

**UNITED STATES BANKRUPTCY COURT**
Honorable Barry Russell
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Bldg. and Courthouse
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                      F 9013-3.1